# IN THE SUPREME COURT OF IOWA

No. 16–1684

Filed March 30, 2018

**STATE OF IOWA,**

Appellee,

vs.

**BRADLEY ELROY WICKES,**

Appellant.

Appeal from the Iowa District Court for Clinton County, Stuart Werling, Judge.

Defendant challenges his conviction for sexual exploitation by a school employee. **AFFIRMED.**

Eric S. Mail and Eric D. Puryear of Puryear Law P.C., Davenport, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

**ZAGER, Justice.**

This case requires us to determine whether hugs between a school employee and a student can constitute prohibited "sexual conduct" under Iowa Code section 709.15(3)(*a*) (2015). Wickes appeals his conviction on one count of sexual exploitation by a school employee under Iowa Code sections 709.15(3)(*a*)(1) and 709.15(5)(*a*). Wickes challenges the district court findings that his hugs with a student constituted "sexual conduct" under Iowa Code section 709.15(3)(*a*)(2) and that the State provided sufficient evidence to show he engaged in a pattern, practice, or scheme of conduct to engage in sexual conduct with a student. Wickes also forwards other claims on appeal. For the reasons set forth below, we affirm the judgment and sentence of the district court.

### I. Background Facts and Proceedings.

In August 2015, Bradley Elroy Wickes was a licensed teacher in the State of Iowa at Camanche High School. Wickes taught high school social studies courses and was actively involved with the students outside of the classroom as the faculty sponsor of the school's student government and as the DJ at school dances. Around August 21, A.S., a 17-year-old student in Wickes's social studies class reached out to Wickes in person to proofread an English paper she had written. From the contents of her paper, Wickes would learn of personal issues A.S. was facing. Following this initial interaction, Wickes initiated contact with A.S. on Facebook Messenger[1] to discuss his thoughts on her paper.

---

[1]"Facebook Messenger is a mobile tool that allows users to instantly send chat messages to friends on Facebook." Techopedia, https://www.techopedia.com/definition/28490/facebook-messenger [https://perma.cc/9T5H-72DZ]. Facebook users can receive these messages via their computer or any other mobile or electronic device when they are logged onto their Facebook accounts. *Id.* Essentially, Facebook Messenger operates the same way mobile texting does, as only the persons sending and

Thereafter, Wickes and A.S. continued to frequently message one another, and their relationship transformed from one of teacher and student to one of a more personal and intimate nature.

Between August 21 and October 5, Wickes and A.S. exchanged approximately 638 pages of messages on Facebook with one another, with many of these pages containing multiple exchanges between them per page.[2] These daily messages took place at all hours of the day, sometimes beginning early in the morning and often ending early the next morning. As their relationship progressed, Wickes and A.S. began to openly share intimate details of their lives. Wickes frequently discussed his marital issues with A.S., including his sexual frustrations with his wife. They also discussed his ultimate decision to leave his wife and children.

Throughout these discussions, Wickes made clear that part of his marital problems stemmed from his desire for more cuddling and physical contact with his wife. For example, Wickes stated, "[H]ugs, cuddling and laying together are so important to me." Wickes also told A.S. that he had previously complained to his wife about the lack of affection and sexual intimacy in their marriage. He made statements such as "I'm a guy that loves to cuddle and show affection"; "I don't need to be seduced after this long of a 'dry period' "; and "I NEED AFFECTION, I'm not saying the booty kind . . . well that too . . . but I freaking am crazy to just feel like [my wife] would like to hold my hand or sit beside

_____

receiving the messages can view them and partake in the conversation. *See generally* https://www.messenger.com [https://perma.cc/6YV4-ARKS].

[2]There were more than 638 pages of Facebook messages. However, the trial court only considered up to the first two entries on page 638 of the transcript because the messages sent beyond that point were sent by the father and stepfather of A.S. after discovering the relationship between A.S. and Wickes.

me." A.S. responded to this statement about his need for affection by saying, "[Y]ou're not crazy for wanting those things. It's part of a relationship. It's a big part." Wickes replied, "Could you turn 30 tomorrow lol."

Further, Wickes used these discussions to flirt with and encourage A.S. into a more intimate relationship with him. Initially, he encouraged A.S. to rely on him emotionally. After Wickes reviewed A.S.'s paper describing her move from the home of one parent to the other, Wickes made statements such as "I didn't know much about why you left. Sounds like it was pretty rough. You should share more with me sometimes if you ever want to"; "Hugs and high fives Monday"; and "Don't hold it all in. That just leads to more depression and anxiety. I'm always available." Wickes subsequently continued to encourage A.S. to rely on him for support in the form of conversations and hugging. For example, when A.S. said, "I know personally I tend to shut down after I open up to someone," Wickes responded, "So can I expect you to shut down and pull away now? Better not."

A.S. and Wickes would both message each other asking about when they would get their hugs from one another. The pair engaged in hugs on an almost daily basis. In addition to their conversations and testimony about the hugs, the evidence of these interactions includes two photographs of Wickes and A.S. embracing—one at the Camanche High School prehomecoming bonfire and one at the homecoming dance. From September 16 until his last Facebook conversation with A.S. on October 5, Wickes made a plethora of statements to A.S. about how sexually attractive he found her and his desire to be in a romantic relationship with her. For example, on September 20, Wickes messaged A.S., "I'm going to cross over to the creeper side a moment and tell you. You are

hot. And pretty[;] kind of a rare combo." This comment came after Wickes had recently seen A.S. at Walmart, they had hugged, and he followed up on their in-person exchange by telling A.S., "I'm glad I just got to touch you[.] OMG[;] touch hug you lmfao."

When A.S. was having issues with a prior boyfriend, Wickes told her, "If I was his age and had you tell me that. I['d] be breaking down walls to get to you." As their conversation that day continued, Wickes told A.S.,

> I'm infatuated with your character and heart. The only reason I feel good these days is I see in you what I want in a woman. I found out there's a girl that gets me and I have hope someday I [will] find another age appropriate girl.

Later, he told A.S., "I just want to hold you. Hug choke the shit out of you," and "I'd sneak over a hug but think that's criminal charges." The next day, Wickes messaged A.S. at school, saying, "Come give me that hug." Later, Wickes messaged A.S., "[Your] hugs and saying just think booty made me keep it together today."

The following day, Wickes told A.S. how "gorgeous, funny, kind, [and] smart" he found her. He continued,

> Permission to be a pervy old man? . . . . Your eyes are amazing, freaking soulful and draws me in. Every face [you] make is freaking adorable. I told you a long time ago you look just like an actress from tv. Still do. And then the pervy stuff . . . you know you've got a great booty! Below that is some smoking legs [that] are beautiful and not the scrawny chicken legs like so many others. You've got a pin up girl build. An hour glass of curves. Read this then delete and I'll go turn myself in.

He followed that comment by telling A.S. he would hug her the next day when she took a restroom break from another class.

A few days later, Wickes and A.S. were discussing the school bonfire photograph that was taken and Wickes told A.S., "I'm keeping my

self-portrait for my personal spank bank. I'm hot." They then discussed the school's "Gender Bender Day," where students and teachers could dress like members of the opposite gender. After A.S. offered a dress for Wickes to borrow, Wickes stated, "I'm just glad you're just willing to give me your booty at a moment's notice . . . Yeah delete that." The pair then began discussing what gets their hearts racing and Wickes told A.S., "Honestly for me it's you and chatting. I look forward to it all day. And I know I probably shouldn't. But just enjoy it. Relaxing funny. Heart to heart." He continued, "I don't exactly know how to say it without violating my moral compass . . . in a different world . . . if time could be changed and I younger or you older. You'd be completely perfect for me."

The following day, Wickes told A.S. that her "chest fits [her] perfectly" in response to a message from A.S. about her weight. When she complained about problems with her living arrangements, Wickes told A.S., "I'd buy you an apartment and be your sugar daddy lol if I could afford it. You deserve to feel comfortable[.] Hugs to you." Further, when A.S. told him she was getting offline to go to sleep, Wickes said, "I'm leaving you unsatisfied or wanting more . . . . That was dirty sorry." A.S. responded by telling Wickes she would be alone after she got offline, to which Wickes replied, "No you're never alone and you're going to go to sleep with me."

On October 2, Wickes told A.S., "Ahhh you always look good. So glad I have you. Had [a] blast as always," and "Can't wait for my hug." The next day, Wickes asked A.S. if he could vent for a moment. He proceeded to tell her,

> Why ohhh why would I meet someone like you! I'll be honest[,] you match me to [a] tee except I'm a pedophile for thinking so. And I'm not thinking sexual[,] just emotional and personal . . . that's not fair for me to put on you.

As their conversations that day continued, Wickes told A.S., "I hate that you feel I might leave ya. I'll be honest[,] I worry about how close we are because I know it would get me in trouble, but I would [be] in a worse place without you." A.S. replied, "[I]f you leave[,] I'd honestly be lost." When Wickes told her he feared a therapist might tell him he could not use social media or texting for a month, A.S. responded, "I hope they'd never suggest that. I just idk. I'd just cry." Wickes then assured A.S., "I wouldn't do it. I want to hug you." Later in the night, Wickes and A.S. were talking about the Camanche homecoming dance that Wickes was DJing and A.S. would be attending. When A.S. made a comment stressing out about her outfit, Wickes responded with, "You're amazing in anything."

After the homecoming dance, where one of the photographs of Wickes and A.S are shown embracing, Wickes told A.S., "You're gorgeous" and "You're smoking." Their messaging continued into the early hours of the morning. Wickes told A.S. that she found him at the dance to take a picture with him "during the perfect song." That song was entitled "Hold Each Other," which Wickes said he played because it made him think of A.S. and their hugs. After A.S. told Wickes that she "would have done anything for a dance tonight," Wickes replied, "I think I would get completely lost if that happened, like everything would shut down around me and I would disappear into those eyes. If I was that someone." He proceeded to tell A.S., "You're hot obviously. But you're soulful. I don't know how to explain it[;] you're just captivating" and "you make me feel great."

On October 4, Wickes separated from his wife and moved away from the marital residence. Later that night, Wickes and A.S. met at Walmart to give each other a hug. Following their physical encounter,

they continued to converse with one another that evening on Facebook. Wickes mentioned to A.S. that she left him with a "wonderful perfume smell." Wickes told A.S. that he was jealous of her boyfriend because "He's got a shot with my perfect person." He further told A.S., "I've been walking alone for so long helping who I could along the way, to realize I was never going to meet someone that saw me. And then bam it's you." The two conversed about their romantic feelings for one another, and Wickes posed A.S. a "hypothetical" question. He asked her if she would like to take their relationship further despite their age gap after she graduated and turned eighteen if his marriage did not work out. He also asked her whether she could "really be happy with a guy that's 36[,] divorced, and has 3 kids." A.S. replied, "Honestly yes. There's such a connection. And I love kids." Soon after, Wickes told A.S., "I'll just say it. I love you. I never meant for this [to] happen[.] [I]t just did." After A.S. acknowledged she felt the same way, Wickes told her, "I've only hugged you and chatted with you and I feel completely tied to you. When my phone light blinks green[,] I know it's a message from you and I get so excited."

This conversation continued early into the next morning, and it became increasingly sexual. Wickes told A.S., "My fantasy was laying in your lap listening to [music.]" After A.S. told Wickes about how she liked to cuddle, Wickes responded, "Booty touches me and it be [M]arvin [G]aye . . . for all of 5 seconds at this point." He also explained to A.S. that his wife had previously told him "she wasn't enjoying [sex] because . . . she didn't get what she needed." He declared that the "lack of closeness sure does kill the [sex] drive." Subsequently, Wickes described how he liked to give sensual back rubs by "lightly caressing with finger tips and . . . spelling out words." He told A.S. that he had "magical

fingers," and that he would "trac[e] along the back side of the leg and circles around the knee." Following this exchange, Wickes asked A.S., "Do you delete these messages? I think I'd be killed if your dad found them."

At school later that day, Wickes messaged A.S., "So I totally freaked out today . . . saw one of the cops in the building then you called to the office . . . thought ut ohhh think I'm dead lol." Wickes and A.S. subsequently talked about their temptations to meet up with one another that evening before ultimately deciding it would cross the line. However, he continued to tell A.S. how "exhilarating" he found their relationship. Soon after this conversation, A.S.'s family discovered her relationship with Wickes, and her father and stepfather took the cell phone to the Camanche Police Department to report what was going on between Wickes and A.S.

On October 6, the principal and school superintendent met with Wickes, who told them his conversations with A.S. had become flirty and turned into "conversations like boyfriend and girlfriend would have." Wickes told them about his hugs with A.S., as well as his out-of-school encounters with her. However, the principal and superintendent were unable to view the Facebook messages because Wickes told them he had deleted them and his smart phone had been destroyed. The school district placed Wickes on administrative leave. Wickes resigned from his teaching position on November 13.

On November 19, Wickes was charged with one count of sexual exploitation by a school employee in violation of Iowa Code sections 709.15(3)(*a*)(1) and 709.15(5)(*a*) (2015), a class "D" felony. Wickes waived his right to a jury trial, and he was convicted following a bench trial. In its findings, the district court asserted,

> [B]y September 20 and thereafter, the clear expression of Wickes' emotional needs and intent was that the hugs become a tool for his sexual gratification. As in *Romer*, Wickes' sexual gratification was from the emotional intimacy exchanged between him and the Student during the hugs and in the intense emotional exchange in the messages he shared with the student. As in *Romer*, there was no sex act between the teacher and student as such is defined by the Code. However, in this instance, unlike *Romer*, there was physical contact between the teacher and student. The Court therefore **FINDS** that hugging can satisfy the statutory requirements of sexual gratification as defined in *Romer* and in 709.15(3)(a)(1) and 709.15(5)(a) of the Code of Iowa (2015). If a hug is given or received for the sexual gratification of Wickes or A.S., then such conduct is "sexual conduct" under the Code. The Court **FINDS** Wickes' hugging of A.S. was for his sexual gratification and it was therefore sexual conduct.

The district court subsequently ordered the preparation of a presentence investigation report and set the matter for sentencing.

On August 24, 2016, Wickes filed a motion for new trial on the grounds that the verdict was both contrary to the law and evidence presented. Wickes also filed a motion in arrest of judgment. The district court denied each motion finding that substantial evidence supported the decision and verdict, which "when weighed, weigh[ed] in favor of the verdict." On October 6, the district court sentenced Wicks to a five-year term of incarceration and a ten-year special sentence. The district court also ordered Wickes to register and be placed on the sex offender registry; to submit a DNA sample; to pay a $750 fine, a thirty-five percent surcharge, and a $250 civil penalty. It also entered a no-contact order preventing Wickes from contacting A.S.

> During sentencing, the district court noted,

> Hugs, pats on the back, the sort of encouragement that an adult can appropriately give to a young person to encourage them in their growth and in their studies would not result in criminal conduct or criminal behavior here. This went well beyond that sort of conduct.

The district court further described the hugging, stating, "It was prurient. It was for Mr. Wickes' sexual satisfaction, a substitute for the lack of sexual fulfillment that he was receiving in his personal life, and that's what makes it a crime." Finally, in declining Wickes's request for a suspended or deferred sentence, the district court asserted that it would decline to impose such a sentence, even if those options were available, "based on the seriousness of the offense and the depth of the betrayal of this position of trust and mentorship that society has given to him." Wickes timely filed an appeal, which we retained.

## II.  Standard of Review.

"Sufficiency of evidence claims are reviewed for correction of errors at law, and we will uphold a verdict if substantial evidence supports it." *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017). Evidence is substantial if, "when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* (quoting *State v. Reed*, 875 N.W.2d 693, 705 (Iowa 2016)). To determine whether the legislature intended to criminalize the acts of which Wickes is accused, we review for correction of errors at law. *State v. Iowa Dist. Ct.*, 889 N.W.2d 467, 470 (Iowa 2017) (noting our standard of review for questions of statutory interpretation is for the correction of errors at law).

"We generally review rulings on motions for new trial asserting a verdict is contrary to the weight of the evidence for an abuse of discretion." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). However, we review rulings on a motion for a new trial for errors at law when there is a claim that the district court failed to apply the proper standard in ruling on that motion. *Id.* Our standard of review of a sentence of the district court is for an abuse of discretion. *State v. Hill*, 878 N.W.2d 269,

272 (Iowa 2016). "A district court abuses its discretion when it exercises its discretion on grounds clearly untenable or to an extent clearly unreasonable[,]" which occurs when the district court decision "is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.* Further, our standard of review for alleged violations of a constitutional right is de novo. *State v. Kurth*, 813 N.W.2d 270, 272 (Iowa 2012).

### III. Analysis.

Wickes presents a number of issues on appeal. First, he argues he did not violate Iowa Code section 709.15(3)(*a*)(2) because his hugs with the student do not constitute sexual conduct under the statute. Second, Wickes contends the State's evidence was insufficient to show that he engaged in a pattern, practice, or scheme of conduct to engage in sexual conduct with the student. Third, Wickes maintains the district court applied the incorrect standard in ruling on his motion for a new trial. Fourth, he alleges the district court abused its sentencing discretion by sentencing him to prison instead of suspending his sentence. Finally, he asserts that his five-year prison sentence constitutes cruel and unusual punishment under the State and Federal Constitutions as applied to his case. He claims it is grossly disproportionate to the offense he committed. We will discuss each claim of error in order.

**A. Sexual Conduct Under Iowa Code Section 709.15(3)(*a*)(2).** Wickes claims there was insufficient evidence to support the district court finding that he engaged in sexual conduct with a student under the sexual exploitation statute. He claims the evidence presented by the State of his sexual conduct with A.S. is insufficient as it was simply hugs he exchanged with her which he contends were merely given to comfort

A.S. rather than for his own sexual gratification. Under Iowa Code section 709.15(3)(*a*),

> Sexual exploitation by a school employee occurs when any of the following are found:
>
> (1) A pattern or practice or scheme of conduct to engage in any of the conduct described in subparagraph (2).
>
> (2) Any sexual conduct with a student for the purpose of arousing or satisfying the sexual desires of the school employee or the student. Sexual conduct includes but is not limited to the following:
>
> a. Kissing.
>
> b. Touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals.
>
> c. A sex act as defined in section 702.17.

Iowa Code § 709.15(3)(*a*)(1–2). Iowa Code section 702.17 defines "sex act" as

> [A]ny sexual contact between two or more persons by any of the following:
>
> 1. Penetration of the penis into the vagina or anus.
>
> 2. Contact between the mouth and genitalia or by contact between the genitalia of one person and the genitalia or anus of another person.
>
> 3. Contact between the finger or hand of one person and the genitalia or anus of another person, except in the course of examination or treatment by a person licensed pursuant to chapter 148, 148C, 151, or 152.
>
> 4. Ejaculation onto the person of another.
>
> 5. By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.

*Id.* § 702.17. Nothing in the evidence establishes that Wickes engaged in a "sex act" as defined in 702.17, or that any physical contact other than hugging occurred between Wickes and A.S. The parties agree that Wickes was a "school employee" and A.S. a "student" as they are defined

under the statute. *See id.* § 709.15(1)(f)–(g). Thus, Wickes's conviction and subsequent appeal hinges on whether the State presented sufficient evidence for the district court to find the hugs between Wickes and A.S. constituted sexual conduct under Iowa Code section 709.15(3)(*a*)(2).

In *State v. Romer,* we examined the definitional parameters of sexual exploitation by a school employee under Iowa Code section 709.15(3) and concluded that "the statute defining 'sexual conduct' does not require physical contact between the school employee and the student to support a conviction for sexual exploitation by a school employee." 832 N.W.2d 169, 181 (Iowa 2013). There, we held that a school employee's conduct in orchestrating and photographing sexual conduct between minors for his own sexual gratification constituted sexual conduct under Iowa Code section 709.15(3). *Id.* at 179–80. We reached our conclusion in *Romer* in part by reference to Iowa's parallel statute restricting a caretaker from engaging in sexual conduct with a dependent adult under Iowa Code section 235B.2(*a*)(3). *Id.* at 180. This section, which has not changed since *Romer,* states that sexual conduct

> includes but is not limited to kissing; touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals; or a sex act, as defined in section 702.17 . . . . Sexual exploitation does not include . . . the exchange of a brief touch or hug between the dependent adult and a caretaker for the purpose of reassurance, comfort, or casual friendship.

Iowa Code § 235B.2(5)(*a*)(3)(b). In *Smith v. Iowa Department of Human Services,* we asserted "there is no language in [section 235B.2(5)(*a*)(3)(b)] that confines the phrase to require the caretaker to affirmatively touch the dependent adult in a sexual manner" and stressed that

> "[s]exual conduct" has a much broader meaning under the statute and requires the actions of the caretaker to be examined in light of all of the circumstances to determine if

the conduct at issue was sexual and done for the purpose of arousing or satisfying the sexual desires of the caretaker or the dependent adult.

755 N.W.2d 135, 138 (Iowa 2008).

We adopted this same broad approach to the meaning of "sexual conduct" under Iowa Code section 709.15(3)(*a*) in *Romer*. *Romer*, 832 N.W.2d at 180. In doing so, we found the legislature's language choice in defining "sexual conduct" under the statute compelling. Specifically, the legislature's statement that "sexual conduct" was "not limited" to the list it provided in section 709.15(3)(*a*)(2). *Id.* Additionally, we noted the legislature's decision not to explicitly define what acts constitute "sexual conduct" under the statute spoke to its intention "to protect students from exploitation by school employees," as well as its acknowledgment that it cannot fully predict and identify all of the manners in which a school employee could sexually exploit students. *Id.* at 181. Therefore, we must examine the actions of the teacher "in light of all of the circumstances to determine if the conduct at issue was sexual and done for the purposes of arousing or satisfying the sexual desires of the [teacher] or the [student]" in violation of 709.15(3)(*a*)(1). *Id.* at 180 (quoting *Smith,* 755 N.W.2d at 138) ("*Smith* confirms that we have previously construed the identical statutory language more broadly than [to require physical contact].").

Similar to our holding in *Romer*, Wickes asks us to interpret the definition of "sexual conduct" found in section 709.15(3)(*a*)(2) to align with our parallel statute governing sexual exploitation by a caretaker of a dependent adult. *See* Iowa Code § 235B.2(5)(*a*)(3)(b). Wickes points to the portion of that statute which provides "the exchange of a brief touch or hug between the dependent adult and a caretaker for the purpose of reassurance, comfort, or casual friendship" is not sexual exploitation. *Id.*

He maintains his hugs with A.S. were given "for the purpose of reassurance, comfort, or casual friendship" and should likewise not be considered sexual conduct under section 709.15(3)(*a*)(2). However, our examination of the evidence in its totality, and as viewed in the light most favorable to the State, shows that Wickes's hugs and relationship with A.S. went far beyond a teacher trying to comfort and reassure a struggling student. *See Ramirez*, 895 N.W.2d at 890 (noting substantial evidence exists to uphold a verdict challenged for sufficiency of the evidence if "when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt").

Of critical importance in our analysis is the context and circumstances that surrounded the physical contact—the hugs—that are at issue here. This context begins with Wickes initiating the Facebook messaging with A.S. It continues with the scenario of a 36-year-old teacher incessantly messaging a 17-year-old female student to describe intimate details of his marriage and his sexual frustrations. This context informs our analysis of what resulted in daily or more often hugs between Wickes and A.S. It is important to note that nothing should prohibit teachers from hugging students for reassurance, comfort, or in congratulation without putting themselves at risk of being charged with the crime of sexual exploitation. But on this record, it is clear from the voluminous messages and their content discussing the hugs and his attraction to A.S., Wickes's intention with these hugs went beyond mere reassurance and support for A.S. Rather, the abundance of messages to A.S. about how attractive he found her, his desire to be in a more intimate relationship with her, and how he was in love with her, linked his sexual desire toward A.S. with the hugs they exchanged.

Likewise, the photos of A.S. and Wickes hugging at the school bonfire and homecoming dance show that these hugs went beyond simple, brief hugs for reassurance or comfort. These photos show the pair in a close embrace, not a mere hug. For example, in one of the homecoming photos, A.S. and Wickes are engaged in a full-frontal hug in which the pair are making chest-to-chest contact, A.S. has her arms wrapped around Wickes' neck, and Wickes has his arms fully wrapped around A.S.'s waist as they pose for the photo. Consequently, in the context of the multiple messages with A.S. as a whole, and in combination with the hugging, there is sufficient evidence that the hugs constituted sexual conduct with A.S. as opposed to an ordinary hug between a teacher and student intended to comfort and reassure the student.

Moreover, the messages from Wickes to A.S. frequently discussed his desire for physical affection, including hugs. As he described it, "hugs, cuddling and laying together are so important." Following the homecoming dance, Wickes told A.S. that he played the song "Hold Each Other" just for her because it made him think of his hugs with her. This conversation quickly parlayed into a more intimate nature. Wickes followed up their discussion regarding his use of certain songs to relay messages to A.S. about their relationship by telling her how he would "disappear into [her] eyes" if he could have danced with her and how "hot," "soulful," and "captivating" he found her.

As their relationship progressed, A.S. began accepting Wickes's messages expressing his desire for a hug as a reason to meet up with him between classes and take bathroom breaks from her other classes to exchange hugs with Wickes. The district court correctly noted that these hugs served to encourage A.S. to become more emotionally dependent

upon Wickes as part of "a gradual escalation of the intimacy and a process of grooming in which Wickes prepare[d] A.S. to accept ever more intimacy." This grooming worked, as A.S. often told Wickes how much she valued their hugs as their relationship grew.

Other messages show that something about touching A.S. brought Wickes sexual gratification. He tended to dwell on his hugs with A.S., messaging A.S. after a number of their hugs to tell her how much he enjoyed them. For example, after their encounter at Walmart, Wickes messaged A.S.,"I'm glad I just got to touch you[.] OMG[;] touch hug you lmfao." After he and A.S. hugged at school, he told A.S., "[Your] hugs and saying just think booty made me keep it together today." Similarly, after the two met up after dark to hug in a Walmart parking lot on October 4, Wickes again messaged A.S. to express his enjoyment from their hug, telling her, "I just got an amazing hug, listened to great music, and have this wonderful perfume smell on me . . . my terrible night is bright now." It was after this hug, and his remarks about the way it transformed his night, that Wickes proceeded to ask A.S. if she would be happy entering into a relationship with him after she got older and graduated high school.

Wickes's awareness that the sentiments he was expressing to A.S. in his messages were wrong is apparent from several comments he made, e.g., "I'm going to cross over to the creeper side a moment and tell you. You are hot"; "You're seventeen and I'm a pedophile"; "Permission to be a pervy old man? . . . Read this then delete and I'll go turn myself in"; "Do you delete these messages? I think I'd be killed if your dad found them"; "I'd sneak over a hug but think that's criminal charges"; and "saw one of the cops in the building then you called to the office . . . thought ut ohhh think I'm dead lol." Nevertheless, these hugs with A.S. became so

important to Wickes that he proclaimed to A.S. that it would be worth getting shot for his relationship with her if he could "get the hug off in time."

Our holding in this case that hugs can constitute sexual conduct under Iowa Code section 709.15(3)(*a*)(2) aligns with our broad interpretation of "sexual conduct" under the statute in *Romer*. *See Romer*, 832 N.W.2d at 180–81.[3] The legislature's decision not to limit sexual conduct to a specific list of acts underscores its concern for the welfare of children whose parents entrust them into the care of school employees. *See id.* The ever-changing technology that gives school employees the opportunity to easily communicate with students through mediums that allow for more discreet communications—like the use of Facebook Messenger in this case—presents school employees with a legion of evolving methods by which they can potentially sexually exploit students. The legislature rightly acknowledged as much by declining to limit its definition of "sexual conduct" to specific conduct and, instead, sought to include those ways in which a school employee sexually

---

[3]Our holding is also supported by caselaw from other states, which have found a hug is sexually abusive or exploitative under similar circumstances. *See, e.g.*, *Walker v. State*, 69 A.3d 1066, 1088 (Md. 2013) (upholding a school employee's conviction for sexual abuse of a minor for an act involving sexual exploitation where the employee frequently hugged and gave the student gifts and wrote her notes discussing the enjoyment he derived from the hugs and how badly he wanted to have a relationship with her while admitting it was wrong); *State v. Rodriguez*, 217 P.3d 659, 664, 666 (Or. 2009) (en banc) (upholding the sexual abuse conviction of a Boys & Girls Club employee who worked with at-risk youths where the employee was "standing behind [the minor boy], caressing his face and pulling his head back" to press it against her breasts based on the totality of the evidence, which showed the employee and the boy often hugged each other, exchanged messages in which she called the boy "babyface" and told him how much she loved him, and spent time together alone outside of the club); *State v. Squiers*, 896 A.2d 80, 82–85 (Vt. 2006) (upholding the defendant's conviction for committing a lewd act with a child under the age of sixteen where the state's evidence showed the defendant hugged the minor tightly while making comments about her breasts, touched her legs while making sexual comments, and made other comments of a sexual nature to the minor).

exploits a student by causing them physical or nonphysical harm. *See id.* at 181. As a result, we decline to narrow the scope of Iowa Code section 709.15(3)(*a*)(2) by finding that hugs alone cannot amount to sexual conduct under the statute. This is especially true in light of the substantial evidence in this case and our prior precedent interpreting the statute.

In summary, the State presented substantial evidence in support of the sexual conduct by Wickes with A.S. This evidence includes all of the communications, the photographs, and the acknowledged physical contact (hugs) constituting sexual conduct between Wickes and A.S. All of this supports the district court decision in this case. The messages Wickes sent to A.S. bordered on obsession, as he sent them daily at all hours of the day. They contain his expressions of jealousy for a former boyfriend of A.S. and sexual overtones that encouraged A.S. to enter into an intimate relationship with him. They also demonstrate Wickes's lust for A.S. through the many comments he made to A.S. about how attractive he found her. It is evident from the content of the more than one-thousand messages between Wickes and A.S. over this forty-five-day period that A.S. had become the object of Wickes's fantasies and sexual desires, and the hugs that coincided with these messages were for his sexual gratification. While the physical contact between the teacher and student in this case may have been brief, given the nature of the contact in conjunction with the other evidence introduced at trial, the State presented substantial evidence that could "convince a rational [factfinder] that the defendant is guilty beyond a reasonable doubt," especially when this evidence is "viewed in the light most favorable to the State." *Ramirez*, 895 N.W.2d at 890 (quoting *Reed*, 875 N.W.2 at 704). Therefore, we find the district court did not err in its ruling on the issue

of whether there was sexual conduct as defined in Iowa Code section 709.15(3)(*a*)(2).

**B. Evidence of a Pattern, Practice, or Scheme to Engage in Sexual Conduct with a Student.** Our disposition of this first issue does not end our analysis. Wickes was charged under Iowa Code section 709.15(3)(*a*)(1). Pursuant to Iowa Code section 709.15(5), the crime of sexual exploitation by a school employee is enhanced from an aggravated misdemeanor to a class "D" felony when the school employee engages in a "pattern or practice or scheme of conduct to engage in any of the conduct" described in Iowa Code section 709.15(3)(*a*)(2), which prohibits sexual conduct with a student for the school employee's or student's sexual gratification. Iowa Code § 709.15(5)(*a*)–(*b*); *id.* § 709.15(3)(*a*)(1). Wickes argues that the statute is illogical because it makes engaging in a pattern, practice, or scheme to exploit a student a felony, while actually having sexual contact with a student is an aggravated misdemeanor. Wickes also maintains there was insufficient evidence to show that he participated in a pattern, practice, or scheme to engage in sexual conduct in violation of Iowa Code section 709.15(3)(*a*)(1). He argues he was only charged with one count of sexual exploitation by a school employee and his conduct involved only one victim in contrast to *Romer* where the school employee's conduct involved multiple students over a course of time.

We need to determine whether the legislature intended to criminalize the act for which Wickes is accused. Namely, sexual exploitation by a school employee when the school employee engages in a pattern, practice, or scheme of conduct to engage in sexual conduct described in Iowa Code section 709.15(3)(*a*)(2), based on the hugs and messages Wickes exchanged with a student. We review for correction of

errors at law. *Iowa Dist. Ct.*, 889 N.W.2d at 470. "We apply our time-honored principles of statutory construction in order to determine whether the district court made errors of law." *Romer,* 832 N.W.2d 169. Additionally, when the terms and meaning of a statute are plain and clear, we enforce the statute as written. *State v. Iowa Dist. Ct,* 730 N.W.2d 677, 679 (Iowa 2007).

In this case, the terms and meaning of the statute are plain and clear. The statute specifically states that "[s]exual exploitation by a school employee occurs" when the school employee engages in "[a] pattern or practice or scheme of conduct to engage in any of the conduct described in paragraph (2)," which prohibits "*[a]ny sexual conduct with a student* for the purpose of arousing or satisfying the sexual desires of the school employee or the student." Iowa Code § 709.15(3)(*a*)(1)–(2) (emphasis added). Thus, the language is clear that scheming to engage in "any sexual conduct with a student," even if it is only one student over a forty-five-day period like Wickes did in this case, constitutes a "pattern or practice or scheme of conduct" criminalized in Iowa Code section 709.15(3)(*a*)(1). *Id.* This interpretation is further supported by the *Black's Law Dictionary* definition of "scheme," which is "[a] systemic plan; a connected or orderly arrangement, esp[ecially] of related concepts", or "[a]n artful plot or plan, usu[ally] to deceive others." *Scheme, Black's Law Dictionary* (10th ed. 2014). Nothing in this definition, or the language of Iowa Code section 709.15(3)(*a*), requires the scheme to involve multiple students or take place over a certain period of time. Consequently, we must enforce the statute as written instead of reading a definition into the law that is not evident from the statute's language. *Iowa Dist. Ct.,* 730 N.W.2d at 679. We conclude that the text of Iowa Code section 709.15(3)(*a*)(1) clearly indicates its application does not

depend on whether Wickes's scheme of conduct involved multiple students or took place over a certain period of time.

Thus, statute creates charges for two different types of sexual exploitation. Iowa Code section 709.15(3)(*a*)(1) is a provision punishing a school employee's ongoing pattern, practice, or scheme of conduct to sexually exploit a student or students, whereas Iowa Code section 709.15(3)(*a*)(2) punishes an individual act of sexual conduct and can result in individual counts. *See* Iowa Code § 709.15(3)(*a*)(1)–(2). Under the unique facts of this case, it is not illogical for Wickes to have been convicted under section 709.15(3)(*a*)(1).

In conclusion, we hold that Iowa Code section 709.15(3)(*a*)(1) does not require the State to show that a school employee engaged in a pattern, practice, or scheme to engage in sexual conduct with multiple students or over a certain period of time. Given this interpretation, and based on the conduct outlined above, we also find the State presented substantial evidence that would "convince a rational [factfinder] that the defendant is guilty beyond a reasonable doubt." *Ramirez*, 895 N.W.2d at 890. This evidence includes dozens of hugs, thousands of messages Wickes exchanged with A.S., the contents of the messages, and the photographs. All of this constitutes substantial evidence that Wickes was engaged in a pattern, practice, and scheme to engage in sexual conduct with A.S. Therefore, we find no error at law in the district court ruling on this issue. Accordingly, there is substantial evidence in this record to support the conviction for sexual exploitation by a school employee under Iowa Code section 709.15(3)(*a*)(1).

**C. The District Court Ruling on Wickes's Motion for a New Trial.** Wickes claims the district court erroneously applied the sufficiency-of-the-evidence standard rather than the weight-of-the

evidence standard in denying his motion for new trial. Under Iowa Rule of Criminal Procedure 2.24(2)(*b*)(6), a district court may grant a motion for new trial "[w]hen the verdict is contrary to law or evidence." Iowa R. Crim. P. 2.24(2)(*b*)6). "A verdict is contrary to the weight of the evidence only when 'a greater amount of credible evidence supports one side of an issue or cause than the other.' " *Ary*, 877 N.W.2d 686, 706 (Iowa 2016) (quoting *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006)). The district court reaches this determination by applying the weight-of-the-evidence standard, which requires the district court to decide "whether 'a greater amount of credible evidence' suggests the verdict rendered was a miscarriage of justice." *Id.* This standard is broader than the sufficiency-of-the-evidence standard because it allows the district court to examine the witnesses' credibility, yet more demanding since it only provides the district court the opportunity to grant a motion for new trial where there is more evidence to support the alternative verdict than the rendered verdict. *Id.* Given this exacting standard, a district court should only grant a motion for new trial "in the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *Id.*

When the district court issued its ruling denying Wickes's motion for a new trial, brought on the grounds that the district court's verdict was contrary to law and the evidence presented at trial, it stated,

> Having reviewed the motions, the motion in arrest and motion for new trial, the Court finds that based on the whole record there is substantial evidence to support the decision and verdict of the Court, that *the evidence, when weighed, weighs in favor of the verdict*, and accordingly will deny both motions.

(Emphasis added.) While the district court's use of the term "substantial evidence" does create some ambiguity surrounding the standard of

review it applied, the district court proceeded to explain that it did weigh the evidence and found such evidence weighed in favor of the verdict.

Contrary to Wickes's notion that the district court improperly referred back to its reasoning denying the motion for judgment of acquittal in ruling on his motion for new trial, the trial transcript does not support that. Wickes relies on the following district court statement for this claim: "that based on the whole record there is substantial evidence to support the decision and verdict of the Court, that the evidence, when weighed, weighs in favor of the verdict, and accordingly [the Court] will deny both motions." Nonetheless, unlike the cases Wickes cites as support for his argument, the district court did not expressly refer back to a previous ruling.

Wickes argues that the district court erred in failing to independently evaluate the credibility of the witnesses. We disagree. Wickes opted for a bench trial in this case, so the district court in reaching its verdict assessed the credibility of the witnesses. Nor did the district court improperly view the evidence in the light most favorable to the verdict. *See State v. Scalise*, 660 N.W.2d 58, 65–66 (Iowa 2003) ("The court is not to approach the evidence from the standpoint 'most favorable to the verdict.' "). Thus, we find that the district court did not commit an error at law in issuing its denial of Wickes's motion for a new trial.

**D. The Sentencing Court Discretion to Impose Sentences Other than Prison.** Wickes argues the district court abused its discretion by sentencing him to prison instead of allowing him to receive a deferred judgment or a suspended sentence. Pursuant to Iowa Code section 907.3, a district court may exercise a variety of sentencing options contained in the statute, including a deferred judgment, deferred sentence, or suspended sentence, all of which would allow the district

court to place the defendant on probation. *See* Iowa Code § 907.3. However, this sentencing discretion "does not apply to a forcible felony or to a violation of chapter 709 committed by a person who is a mandatory reporter of child abuse under section 232.69 in which the victim is a person who is under the age of eighteen." *Id.*

Wickes concedes that he was convicted under chapter 709 while he was a mandatory reporter of child abuse and that his victim was under the age of eighteen at the time. Nevertheless, Wickes alleges that the statute is ambiguous and, therefore, must be construed in his favor so that the district court could have sentenced him to a deferred judgment or suspended sentence. *See State v. Nall*, 894 N.W.2d 514, 519 (Iowa 2017) ("[U]nder the rule of lenity, we take a narrow approach to construing ambiguous criminal laws."). Since the statutory definition of "forcible felony" states that "[s]exual exploitation by a counselor, therapist, or school employee in violation of section 709.15" is not a forcible felony, Wickes argues section 907.3 is internally inconsistent. Iowa Code § 702.11(2)(*d*). Consequently, Wickes maintains, reasonable minds could interpret 907.3 differently because it does not make sense that the "legislature [would] specifically exempt sexual exploitation by a school employee from the definition of forcible felony but at the same time seemingly include conduct for violations of Chapter 709."

To interpret a statute, we look first to the plain language and apply the statute as written if it is unambiguous. *Nall*, 894 N.W.2d at 518. Additionally, "[s]tatutory text may express legislative intent by omission as well as inclusion," so we may not expand or alter the language of a statute in a way that is not evident from the legislature's word choice within the statute. *Iowa Dist. Ct.*, 730 N.W.2d at 679. We conclude that the statute is not ambiguous. Nothing in the plain language suggests the

legislature intended for section 907.3 to apply to the crime of sexual exploitation by a school employee. While sexual exploitation by a school employee is not considered a forcible felony under section 702.11, the legislature still made clear that section 907.3 does not apply "to a violation of chapter 709 committed by a person who is a mandatory reporter of child abuse under section 232.69 in which the victim is a person who is under the age of eighteen." Iowa Code § 907.3. Hence, the plain language of the statute is clear that the legislature sought to include sexual exploitation by a school employee—a violation of chapter 709—as an offense for which the sentences authorized in section 907.3 were not available.

"When a sentence imposed by a district court falls within the statutory parameters, we presume it is valid and only overturn for an abuse of discretion or reliance on inappropriate factors." *State v. Hopkins*, 860 N.W.2d 550, 554 (Iowa 2015). A defendant must affirmatively show that the sentencing court relied on improper evidence to overcome this presumption of validity. *Id.* The question we must answer is not whether the challenged sentence is one we would have imposed, but rather, "whether the sentence imposed was unreasonable." *Id.* In this case, the sentence the district court imposed on Wickes fell within the statutory parameters of Iowa Code section 907.3. As a result, we find that the district court did not abuse its discretion in sentencing Wickes to prison because its decision was not based "on grounds clearly untenable or to an extent clearly unreasonable." *Hill*, 878 N.W.2d at 272.

**E. The Constitutionality of Wickes's Sentence.** Wickes asks us to find that if the district court did not abuse its discretion in sentencing, his five-year prison sentence with no mandatory minimum before parole

eligibility violates the Cruel and Unusual Punishment Clause of both the State and Federal Constitutions. Wickes argues that as applied to him, the sentence is grossly disproportionate to his offense. Both the Federal and State Constitutions prohibit the imposition of cruel and unusual punishment. *See* U.S. Const. amend. VIII; Iowa Const. art. 1, § 17. The prohibition against cruel and unusual punishment "embraces a bedrock rule of law that punishment should fit the crime." *State v. Bruegger*, 773 N.W.2d 862, 872 (Iowa 2009).

We use a three-part test to determine whether a sentence is "grossly disproportionate" under the Cruel and Unusual Punishment Clauses of the State and Federal Constitutions. *Id.* at 873. The first part is a threshold inquiry examining "whether the sentence being reviewed is 'grossly disproportionate' to the underlying crime," which "involves a balancing of the gravity of the crime against the severity of the sentence." *Id.* (*quoting Solem v. Helm*, 463 U.S. 277, 290–91, 130 S. Ct. 3001, 3010 (1983)). No further analysis is required if the sentence being reviewed does not raise an inference of gross disproportionality. *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012). If the threshold test is met, we partake in the second step, which requires us to engage in an intrajurisdictional analysis to compare the challenged sentence to sentences of other crimes within our jurisdiction. *Bruegger*, 773 N.W.2d at 873. Under the third step, we engage in an interjurisdictional review and examine the sentences for similar crimes in other jurisdictions. *Id.*

There are certain general principles we consider in determining whether a defendant's sentence is "grossly disproportionate" that come into play in our review of Wickes's sentence. *See Oliver*, 812 N.W.2d at 650–51. First, "we owe substantial deference to the penalties the legislature has established for various crimes." *Id.* at 650. Second, while

we engage in a more stringent review of a defendant's sentence for "gross disproportionality" under the Iowa Constitution than available under the Federal Constitution, "it is rare that a sentence will be so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review." *Id.* Finally, we examine the unique features of each case as part of our threshold determination because these features "can 'converge to generate a high risk of potential gross disproportionality.' " *Id.* at 651 (quoting *Bruegger*, 773 N.W.2d at 884).

In *Bruegger*, we held that the defendant could present an as-applied constitutional challenge to his twenty-five-year prison sentence for statutory rape because the facts of his case amounted to "a relatively rare case where an individualized assessment of the punishment imposed should be permitted." 773 N.W.2d at 884. There, the unique circumstances of the case "converge[d] to generate a high risk of potential gross disproportionality—namely, a broadly-framed crime, the permissible use of preteen juvenile adjudications as prior convictions to enhance the crime, and a dramatic sentence enhancement for repeat offenders." *Id.* As a result, we vacated his sentence and remanded the case for a new sentencing hearing to allow the parties to present evidence regarding the constitutionality of the sentencing statute as applied to the defendant. *Id.* at 886. In contrast, in *Oliver*, we found a defendant's sentence of life in prison without the possibility of parole for his second conviction of third-degree sexual abuse, which resulted in a class "A" felony under the enhanced sentencing provisions of Iowa Code section 902.14(1), did not amount to cruel and unusual punishment as applied to him. 812 N.W.2d at 651–52. In doing so, we noted the defendant's sexual exploitation of a thirteen-year-old victim while the defendant was thirty-three years old was exactly the type of exploitation that his charge

of sexual abuse in the third degree "was designed to prevent, not conduct that was inadvertently caught by a broadly written statute." *Id.* at 651.

Upon examination of the threshold question with these principles in mind, we conclude that this is not the rare case where the challenged sentence is "so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review." *Id.* at 650. Wickes's claim that it is cruel and unusual punishment to sentence him to prison for hugs since he did not engage in any other physical or sexual contact with the student overlooks the gravity of his offense. Wickes's prison sentence is not simply punishing him for giving hugs to a student. Instead, his punishment reflects the fact that Wickes abused his position of trust as a teacher to sexually exploit a student for his own gratification.

The State's evidence shows that A.S. was an easily influenced student. As the aforementioned messages Wickes exchanged with A.S. clearly demonstrate, Wickes sought to make A.S. emotionally dependent on him. When A.S. progressively placed more trust in Wickes, his conversations with her turned more sexual and inappropriate. By the time Wickes's behavior came to the attention of the police and the Camanche School District, Wickes had already "hypothetically" asked A.S. about being in a romantic relationship with him once she graduated and got older. He had also made numerous comments to A.S. about his romantic intentions with her and his sexual attraction to her. The fact that Wickes's crime involved hugs instead of an actual sex act does not take away from the emotional and psychological toll his actions had on the student he exploited. The victim's mother testified at sentencing regarding the gravity of Wickes's offense and its impact on A.S., describing the "embarrassment and fear" A.S. faced due to "the bullying

and harassment from social media and at school. She feared for her physical safety as threats were made against her." The victim's mother continued,

> To this day, she continues to feel scared because of the grooming behavior of this teacher she trusted. She has moved away from her home and friends in Clinton because of the attitudes of the community against her. We don't know when she'll recover from this ordeal fully, if at all.

As the evidence shows, the gravity of Wickes's offense extends beyond the hugs between Wickes and A.S., and Wickes's claim that he was sent to prison simply for hugging a student is a gross mischaracterization.

Contrary to the notion that his behavior was inadvertently caught in a broad statute, Wickes's behavior is exactly the type of exploitation Iowa Code section 709.15(3)(*a*) was designed to prevent. While Wickes's offense was part of a broad statute, the statute did not inadvertently capture his offense. This statute does not limit its definition of "sexual conduct" to specific conduct. The behavior Wickes exhibited is the kind the legislature intended to capture with this statute.

Further, the legislature's decision to designate sexual exploitation by a school employee as a felony offense reflects the seriousness of the offense in this case. As we noted in *Bruegger*, "legislative judgments are generally regarded as the most reliable objective indicators of community standards for purposes of determining whether punishment is cruel and unusual." 773 N.W.2d at 873. Wickes mandatory five-year prison sentence reflects a larger community standard that seeks to punish adults for taking advantage of children. Our legislature has consistently provided special protections for children against sex crimes and harsher punishments for the offenders who commit these crimes. This is "in light of the risk of disease, pregnancy, and serious psychological harm that

can result from even apparently consensual sexual activity involving adults and adolescents." *Id.* at 886; *see, e.g.*, Iowa Code § 709.8(2)(*a*) (enhancing lascivious acts with a child to an aggravated offense where the offense involves "[f]ondl[ing] or touch[ing] the genitals of a child, "[c]aus[ing] a child to fondle or touch the person's genitals or pubes," or "[c]aus[ing] the touching of the person's genitals to any part of the body of a child"); *id.* § 709.12 (indecent contact with a child is an aggravated misdemeanor); *id.* § 902.14 (provides enhanced penalties for sexual abuse or lascivious acts with a child). Thus, it was within the legislature's prerogative to designate sexual exploitation by a school employee a felony offense. It was the decision of the legislature to impose the five-year prison sentence on Wickes in this case based on his criminal conduct. The balance the legislature created between the gravity of the crime and the severity of the sentence does not render Wickes's sentence "grossly disproportionate" to his underlying crime.

Finally, this is not the exceptional case where the unique circumstances "converge to generate a high risk of potential gross disproportionality." *Bruegger*, 773 N.W.2d at 884. Unlike the defendant in *Bruegger*, Wickes's offense was included as part of a broad statute because the legislature specifically intended to capture the sexual exploitation of a student by a school employee through physical and nonphysical means. *See Romer*, 832 N.W.2d at 180–81. Likewise, Wickes's case does not involve "the permissible use of preteen juvenile adjudications as prior convictions to enhance the crime[] and a dramatic sentence enhancement for repeat offenders" as was the case in *Bruegger*. *Bruegger*, 773 N.W.2d at 884. Neither of these factors was in play here.

In conclusion, Wickes provides us with no facts unique to his case to overcome the deference we provide the decision of the legislature to

establish an appropriate penalty for sexual exploitation by a school employee. Wickes's sentence does not lead to an inference of gross disproportionality. Therefore, we need not proceed further in our analysis to examine the intrajurisdictional and interjurisdictional comparisons. Wickes's sentence of five years in prison, with no mandatory minimum before parole eligibility, is not cruel and unusual punishment.

**IV. Conclusion.**

For the aforementioned reasons, we affirm the judgement and sentence of the district court.

**AFFIRMED.**

All justices concur except Appel, Wiggins and Hecht, JJ., who concur specially.

**APPEL, Justice (concurring specially).**

I concur in most of the majority opinion.  I write only to clarify the relationship between the State and Federal Constitutions in this case.

While both the State and Federal Constitutions have similarly worded provisions related to cruel and unusual punishment, *see* U.S. Const. amend. VIII; Iowa Const. art. I, § 17, there is no reason why we must imitate the federal approach in our interpretation of the open-textured state constitutional provision.  There are many potential approaches to the open-ended language in the cruel and unusual punishment provisions of State and Federal Constitutions.  The mere fact that the United States Supreme Court has developed an approach does not bind us to follow it if we think there is a better, sounder approach under the Iowa Constitution.  And, whenever we consider federal precedents involving individual rights, we must consider Justice Harlan's admonition that the protections afforded by individual liberties tend to be diluted by the lowest-common-denominator pressures of federalism, considerations wholly absent when we consider questions under the Iowa Constitution.  *Baldwin v. New York*, 399 U.S. 117, 136, 90 S. Ct. 1914, 1925 (1970) (Harlan, J., dissenting); *see State v. Short*, 851 N.W.2d 474, 485 (Iowa 2014).

Yet, in many contexts, litigants simply have not asked us to depart from federal precedents in the interpretation of the Iowa Constitution.  Often times, litigants only provide us with a naked citation to the Iowa Constitution and then briefly urge us to apply federal standards in a fashion that vindicates their position.  *See State v. Ochoa*, 792 N.W.2d 260, 265 (Iowa 2010) (noting that in some cases an independent analysis of the state constitutional claim did not occur "perhaps because the

parties did not make an independent argument under the state constitution"). That is what happened in *State v. Bruegger*, 773 N.W.2d 862 (Iowa 2009). In *Bruegger*, we emphasized that although some states courts had adopted a variety of different substantive approaches to cruel and unusual punishment under state constitutions, Bruegger did not ask us to depart from federal substantive standards. *Id.* at 879–83. Similarly, in *State v. Oliver* and in this case, the appellant did not argue for a substantive standard under the Iowa Constitution different from federal precedent. *See* 812 N.W.2d 636, 640 (Iowa 2012) (describing how appellant argued that his sentence was disproportionate under the *Bruegger* test).

When a party brings claims under parallel provisions of the Iowa and United States Constitutions, but does not advance a different substantive standard under the Iowa Constitution but simply incorporates prevailing federal standards, we apply the prevailing federal substantive standard but reserve the right to apply federal standards in a fashion more stringent than federal cases. *State v. Graham*, 897 N.W.2d 476, 481 (Iowa 2017); *State v. Lindsey*, 881 N.W.2d 411, 427 (Iowa 2016); *State v. Gaskins*, 866 N.W.2d 1, 27 (Iowa 2015); *State v. Breuer*, 808 N.W.2d 195, 200 (Iowa 2012); *State v. Pals*, 805 N.W.2d 767, 771–72 (Iowa 2011); *Bruegger*, 773 N.W.2d at 883.

As a result, *Bruegger* and *Oliver* do not amount to an adoption of the federal standard under the Iowa Constitution for as-applied challenges to adult criminal sentences. Rather, they only reflect the limited advocacy of the parties. The parties by agreement cannot establish the substance of state constitutional law. Certainly *Bruegger* and *Oliver* do not stand as stare decisis for a question not presented to the court, namely, whether we should depart from prevailing federal

standards in the interpretation of article I, section 17 of the Iowa Constitution. *See Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 614 (Iowa 2017) (Appel, J., concurring in part and dissenting in part) ("When a legal principle is embraced by the parties by agreement and is not contested on appeal, the court's subsequent recitation of the legal principle is not a holding in the case that was a product of an adversary proceeding."); *see also United States v. Hemingway*, 734 F.3d 323, 335 (4th Cir. 2013); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2d Cir. 2000); *Berger v. Gen. United Grp., Inc.*, 268 N.W.2d 630, 635 (Iowa 1978); *Fulton Found. v. Wis. Dep't of Taxation*, 108 N.W.2d 312, 316–17 (Wis. 1961); *Silver Lake Sanitary Dist. v. Wis. Dep't of Nat. Res.*, 607 N.W.2d 50, 54 (Wis. Ct. App. 1999). That determination will await a case where advocates actually urge that we depart from federal standards and ask us to adopt a different substantive approach to cruel and unusual punishment. In other words, any substantive adoption of a federal standard occurs only when the parties urge us to materially depart from the federal standards and we explicitly reject the departure as a necessary holding in the case.

To summarize, in cases where both parties assume the prevailing federal standard provides the proper approach under the Iowa Constitution, we do not "adopt" the federal standard, but simply, for the purposes of the case, accept the parties' framework and narrowly decide the issue as presented by the parties. Even in these cases, because the federal standards are often quite amorphous and open to diverse application, we reserve the right to apply the standards in a fashion different from federal precedents. Here, Wickes has not advanced a separate standard under the Iowa Constitution. We therefore are not "adopting" the federal standard here, but are deciding the case using

federal standards as presented by the parties for the purposes of this case only.  *See, e.g.*, *More v. State*, 880 N.W.2d 487, 499 n.3 (Iowa 2016); *State v. Lyon*, 862 N.W.2d 391, 398 (Iowa 2015); *City of Sioux City v. Jacobsma*, 862 N.W.2d 335, 340 (Iowa 2015); *State v. Brooks*, 760 N.W.2d 197, 204 n.1 (Iowa 2009).

Whether we should adopt a standard different than federal precedents under the Iowa Constitution was not raised and not considered in *Bruegger*, *Oliver*, and this case.  While we have no occasion to develop a different standard here, I have significant doubts about any constitutional framework that produces results like that in *Ewing v. California,* where a sentence of twenty-five years to life for a theft of golf clubs under a three strikes law was held not to be grossly disproportionate.  538 U.S. 11, 19, 30–31, 123 S. Ct. 1179, 1184, 1190 (2003) (plurality opinion).  And, in some of our cruel and unusual punishment cases, we have rightly placed far less significance on certain elements of the federal test—for example, interjurisdictional review, which is a more appropriate consideration for the United States Supreme Court than a state court because the United States Supreme Court establishes nationwide constitutional rules, while a state court's rulings have a more limited effect.  *See State v. Lyle*, 854 N.W.2d 378, 386–87 (Iowa 2014) (holding lack of a nationwide consensus against a sentencing practice is not dispositive under the Iowa Constitution).  And while deference to legislative judgment is an important consideration, this court is the ultimate interpreter of Iowa's cruel and unusual punishment clause and, as a result, we have in some contexts placed more emphasis on independent judgment than most federal precedents.  *See id.* at 387–88.

The majority rightly cites our decision in *Bruegger*, 773 N.W.2d 862, as an exemplar of when a sentence is so grossly disproportionate as to amount to cruel and unusual punishment under the Iowa Constitution. In *Bruegger,* we noted that the unique features of the case raised a question of whether the defendant's sentence amounted to cruel and unusual punishment under the Iowa Constitution. *Id.* at 884. The unique features of the case, however, were not intended to be and cannot be converted into a narrow, mandatory set of criteria through which a case must pass through, like a camel through the eye of a needle, to give rise to an as-applied challenge based on cruel and unusual punishment. Instead, *Bruegger* presents an illustrative example only of a punishment so excessive as to give rise to serious constitutional doubts.

Yet, I agree with the ultimate conclusion of the majority. Wickes plainly crossed a clear line and he knew it. A relatively short prison sentence where a thirty-six-year-old trusted teacher took advantage of a seventeen-year-old student for sexual purposes does not present, in my judgment, a *Bruegger*-type situation that requires us to intervene under article I, section 17. I therefore concur in the judgment.

Wiggins and Hecht, JJ., join this special concurrence.