# IN THE COURT OF APPEALS OF IOWA

No. 21-1812
Filed March 8, 2023

**STATE OF IOWA,**
　　　Plaintiff-Appellee,

**vs.**

**JORGE MALDONADO,**
　　　Defendant-Appellant.
_____

　　　Appeal from the Iowa District Court for Johnson County, Chad Kepros, Judge.


　　　A defendant appeals his convictions for sexual abuse, challenging the admission of a forensic interview and sufficiency of the evidence. **AFFIRMED.**


　　　David R. Fiester, Cedar Rapids, for appellant.

　　　Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.


　　　Heard by Bower, C.J., and Badding and Ahlers, JJ.

**BADDING, Judge.**

The "recurring issue of when forensic interviews of child complaining witnesses should be admitted into evidence" under the residual hearsay exception has reared its head again in this appeal. *See State v. Skahill*, 966 N.W.2d 1, 4 (Iowa 2021). Jorge Maldonado, who was convicted of sexually abusing two of his daughters, claims that because the younger child's testimony at trial was sufficiently detailed, the district court erred in finding it was necessary to admit a video of her forensic interview into evidence. He also claims there was insufficient evidence that he performed a sex act with his daughters or that the oldest child's post-traumatic stress disorder is a serious injury. We affirm.

**I.     Background Facts and Proceedings**

Jorge Maldonado is the father of three daughters: Mya (born 2007), Carla (born 2010), and Bryn (born 2014).[1] While living with his daughters and their mother, he began sexually abusing the two oldest children. He was charged by trial information in February 2020 with four counts of first-degree sexual abuse and two counts of second-degree sexual abuse. A later amendment to the trial information removed one count of second-degree sexual abuse, and the case proceeded to trial in September 2021.

Mya was fourteen years old at the time of trial. She testified that in the summer of 2019, when she was about twelve years old, Maldonado pulled down her pants while they were in her parents' bedroom and "started touching [her]."

---

[1] We have used a random name generator for the children's names since they share the same initials. The abuse only concerns Mya and Carla.

Mya said that this time, Maldonado touched her vagina and put his finger in it.[2]  He threatened that if she told anyone, he would hurt her, her sisters, and their mother.

On a later date, although she could not remember exactly when, Mya said Maldonado touched her again, this time in the bedroom she shared with her sisters.  She testified that Maldonado "pulled my pants down and made me lay down on my bed.  He took all of my—he took off my pants and my underwear, and he put his mouth on my vagina, and he then put his penis inside me."  Mya asked him to stop and tried to push him off, but Maldonado told her to shut up, pushed her arms away, and held her down.

After that summer, Mya testified that Maldonado kept doing the same things to her throughout their home—in the living room, kitchen, and bathroom—sometimes when her mother was gone and sometimes when she was home.  He groped her at times, and he inserted his penis into her mouth, vagina, and anus on others.  She testified that she "told him to stop, that I didn't like it, that it was wrong, that he was my dad, and he shouldn't be doing that stuff," but "[h]e didn't care."

Mya decided to tell her mother about the abuse on December 23, 2019, during her winter break from school, because she was worried about her little sisters.  The mother remembered wanting to take the girls out to eat that day, but she testified Maldonado was acting "aggressive[ly]" and told her that she could not leave with them.  The mother and the children stayed away from Maldonado in one of the bedrooms, but at some point, Maldonado came in and took Mya out to the

---

[2] Mya testified Maldonado engaged in similar conduct when she was seven or eight years old, but she never told anyone.

living room. When the mother tried to check on Mya, who was crying, Maldonado got upset and kicked her out of the living room.

Sometime later, Mya came into the bedroom and told her mother that "her dad was doing things to her, that he was touching her." The mother said that Mya was nervous, crying, and "scared because all of [them] have gone through some violence." When Maldonado found out what Mya revealed, he came back into the bedroom with a knife and, according to Mya's testimony, dragged her out by her hair into the living room. The mother also remembers Maldonado coming into the bedroom with a knife, which she says he pointed at Mya's chest while threatening to kill them all and burn the house down if Mya said anything.

After she was dragged back into the living room, Mya testified that Maldonado told her to "get on the couch and to pull [her] pants down." When she refused, Maldonado banged her head on the floor, spit on her, and threatened to burn her with his cigarette. The mother heard Mya yell, and when she went into the living room, Mya was on the floor. Mya said, "Mom, Mom, I want to tell you something." But then Maldonado "grabbed her and threw her against the ground." The mother asked him why he was doing this to his daughter. At first he denied doing anything, but then he told the mother "that he was going to fuck [Mya] so that [the mother] could see how much he enjoyed her." The mother and Mya were able to retreat to the bedroom.

When things calmed down, the mother got Maldonado to believe that they needed to take Carla to the hospital because she was sick. After the whole family got into the car, Maldonado included, the mother told Maldonado that she did not want him to come with them. Maldonado said that if he was staying, so was Mya.

The mother agreed but, as soon as Maldonado got out of the car, she locked the doors and drove off with the children. They went to a nearby church and called the police.

A police officer responded to the church, where Mya told him that Maldonado had been physically abusing the mother. She did not tell the officer about the sexual abuse because she was scared that Maldonado would carry through with his threats. Law enforcement referred the matter to the Iowa Department of Health and Human Services. A social worker assigned to investigate the report met with the mother and the children the next day, upon which he learned of the allegations of sexual abuse. The social worker then contacted the child protection center and law enforcement, which set in motion sexual abuse examinations and forensic interviews of both children.

Mya's examination was conducted by Dr. Regina Butteris on January 9, 2020. Dr. Butteris did not observe any outward signs of sexual abuse. But she noted Mya had gone through puberty, so "there can be sexual activity without an injury." Dr. Butteris also opined, "[a] lot of times sexual abuse doesn't leave an injury to begin with." Kristin Kasner, a sexual assault nurse examiner, conducted Carla's physical examination on January 17 while Carla was at the child protection center for her forensic interview. As with Mya, Kasner did not observe any physical signs that Carla had been sexually abused, although she testified: "That is not unusual at all. 95 or greater percent of children who have examinations have no findings."

Carla's forensic interview on January 17 was led by Katie Burrell. At the start of the interview, Burrell told Carla, who was nine years old at the time, that

she was being recorded on video and others were watching. She also told Carla how important it was to tell the truth. After some rapport building, Carla pointed to her genital area and reported: "My dad touched me here." Upon questioning, she specified that her dad touched her "kola" (a Spanish term for going to the bathroom) with his hand on the bed in her mother's room, just one time. Carla said she had been sleeping in her bunk bed, but when she got up to go to the bathroom, her dad "wanted [her] to come here or something." Then, Carla continued, he "touched her kola" and smelled his fingers. She recalled exactly what pajamas she was wearing and said Maldonado took off her pants and underwear. Carla added that he touched her butt with what she called his "nickel," during which he was "shaking." She gestured that his nickel was in Maldonado's genital area, and she drew a picture of it. Carla said the nickel felt "weird" and "not good." She elaborated that Maldonado unzipped his pants and took his nickel out of his underwear. Carla said that she never told anyone because "dad wanted a secret."

In late April, the State filed a notice of intent to offer the video of Carla's interview under the residual hearsay exception in Iowa Rule of Evidence 5.807. The State also filed a motion under Iowa Code section 915.38 (2019) to have both children testify via closed-circuit television, which the court granted. At the hearing on the motion, the children's mental-health therapist, Diane Tonkyn, predicted that Carla would be unable to testify at trial even with the use of a closed-circuit television. She explained: "Anytime that I've attempted to talk to [Carla] about . . . her father, she shuts down and, in fact, in one instance pulled a sheet and blanket over her head and said, I don't exist and I don't want to." Tonkyn also noted that Carla suffered from an autism-like condition that makes it "hard for her to make

connections with people" and interferes with her ability to "think and interact with the world in a neurotypical way."

Consistent with Tonkyn's prediction, at Carla's deposition about two weeks before trial, she answered most of defense counsel's questions with, "I forgot," "I can't remember," or "I don't know." The State accordingly asked the court to rule on whether Carla's video interview could be admitted under the residual hearsay exception.[3] Maldonado resisted, arguing that any assessment on the necessity prong of that exception must wait until Carla's trial testimony is completed. The court agreed and reserved ruling until trial.

By trial, Carla was eleven years old and her testimony about the abuse was not as detailed as it was in her forensic interview. She testified that when Maldonado lived with them, he touched her private parts with his hand and his own private parts. She said that it hurt, and she told him to stop, but she never told anyone because he would get mad. Beyond that, Carla wasn't able to provide many other details, often answering questions from the State with: "I forgot."

After Carla finished testifying, the district court revisited the State's request to admit the interview video into evidence under rule 5.807. The court observed that during Carla's testimony, "she quickly became very upset during the questioning. Her voice was shaky. She became very quiet. She fidgeted with her hands and moved around in her chair. She began crying early in the testimony and said she needed a break early on." With these observations, the court granted

---

[3] The State also argued the interview video fell under exceptions to the rule against hearsay for statements made for medical diagnosis or treatment and recorded recollection. *See* Iowa R. Evid. 5.803(4), (5). The State later withdrew those grounds for admissibility during oral argument at trial.

the State's request, finding the statements Carla made in the video were the most probative evidence available in comparison to other evidence the State had taken reasonable efforts to obtain. *See* Iowa R. Evid. 5.807(a)(3). The video was then played for the jury.

The jury also heard from Tonkyn, who testified about the effects of Maldonado's sexual abuse on Mya. Tonkyn began providing therapy to Mya in February 2020. During their first session, Mya

> was very anxious, expressing real difficulty concentrating and focusing in school, really having a hard time staying in the classroom. She reported that she was having invasive memories of her experiences, and it was difficult to sit and deal with that in the classroom. She expressed having some sleep disturbance. There was a whole variety of things. It was a lot.

Mya opened up more in the second session about one week later, following which Tonkyn diagnosed her with post-traumatic stress disorder. Tonykyn testified Mya was still suffering from that disorder at the time of trial, which she opined had "weakened or destroyed [Mya's] . . . normal mental functions."

After considering this evidence, the jury found Maldonado guilty as charged. The district court denied Maldonado's "combined motion for a new trial and in arrest of judgment," and sentenced him to concurrent terms of life imprisonment without parole for the four convictions of first-degree sexual abuse and an indeterminate term of twenty-five years, with a seventy percent mandatory minimum, on the second-degree sexual abuse conviction, to be served consecutive to the life sentences.

Maldonado appeals, claiming (1) the court erred in admitting the video of Carla's forensic interview under the residual exception to the rule against hearsay,

and (2) the evidence was insufficient to support the sex-act element of Maldonado's convictions on all counts and the serious-injury element on four counts of first-degree sexual abuse.

## II.      Standards of Review

"[B]ecause the district court lacks 'discretion to admit hearsay in the absence of a provision providing for it' or deny the admission of hearsay if it falls within an exception," appellate courts "review the district court's evidentiary rulings on hearsay for errors at law." *State v. Thompson*, 982 N.W.2d 116, 121 (Iowa 2022) (citation omitted). Challenges to the sufficiency of the evidence are also reviewed for correction of errors at law. *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022).

## III.      Analysis

### A.      Residual Exception

We start with Maldonado's claim that the district court erred in allowing the admission of Carla's forensic interview under the residual exception to the rule against hearsay in Iowa Rule of Evidence 5.807.[4] This exception is "often used . . . to admit the out-of-court statements of child sex abuse victims." *Skahill*, 966 N.W.2d at 11. But, as our supreme court cautioned in *Skahill*, it is a narrow exception that should be used only sparingly so that it does not "swallow the rule against hearsay." *Id.* at 10. The five requirements of the exception—

---

[4] This rule was amended effective January 1, 2023, and applies to all actions filed on or after that date, as well as in trials and evidentiary hearings conducted on or after that date for actions filed before that date. The amendment does not apply to Maldonadao's case, which was filed in February 2020 and tried in September 2021.

"trustworthiness, materiality, necessity, service of the interests of justice, and notice"—"are designed to limit the exception and protect the overarching rule against hearsay." *Id.* at 10–11 (citation omitted). Notably, "[t]hese are not factors to be weighed; all five requirements must be satisfied." *Id.* at 10.

Of the five requirements, Maldonado only contests the presence of necessity on appeal. He submits the State's use of the video was unnecessary because (1) although Carla was "nervous and uncomfortable" during her trial testimony, arrangements were made to alleviate those concerns[5]; (2) "[t]he questioning by the prosecution was fairly soft and open-ended," with no "'hard hitting' questions or pressure"; and (3) Carla was able to provide sufficient detail of the abuse in her testimony, specifically that Maldonado touched her vagina or "kola" with his hand and his private parts or "nickel" and that it hurt.

Necessity, as it relates to the residual exception, "is not used in the absolute sense." *Id.* at 11. Instead, "[t]he hearsay evidence only needs to be 'more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts,' as the rule requires." *Id.* (quoting Iowa R. Evid. 5.807(a)(3)). "The word 'probative' means '[t]ending to prove or disprove.'" *Id.* (alteration in original) (citation omitted). Probativeness "is not viewed in a vacuum," and is instead considered "in relation to the other evidence available to the State, particularly [the witness's] live testimony." *Id.*

---

[5] Maldonado points out that Carla was allowed to testify from a separate room than Maldonado by video, a guardian ad litem was appointed and present during her testimony, and Carla was "allowed to take a break whenever she requested and was allowed to color while she was on the stand."

So the overarching question is whether the video interview "tend[s] to prove what happened to [Carla] better than her trial testimony in which she was subject to cross-examination." *See id.* In other words, "[t]he necessity element requires the hearsay evidence to be superior to other available evidence, not just reliable." *Id.* at 13. As a litmus test, "when the same evidence is available through in-court testimony, hearsay statements are generally not necessary under the residual exception." *Id.* at 13–14. But the residual exception has been used when a child's testimony had "a significant gap or weakness" or "was inconsistent and hesitant," and "when the child testified at trial to abuse but was unable to provide important details in their trial testimony." *Id.* at 14–15.

In *Skahill*, the supreme court found the rationale underlying the use of the residual exception "to fill in important details that are missing from a child's in-court testimony" did not apply to its facts. *Id.* at 15. That is because the complaining child witness's trial testimony "was responsive and forthcoming"; "it was evident that she remembered what happened"; and, "[w]hile her trial testimony may not have been quite as vivid as her [statements in the forensic] interview, it was not hesitant or contradictory." *Id.* Because the child "testified to all of the critical points of the State's case—that Skahill showed her his 'private,' asked her to 'wiggle it,' and touched her 'privates' under her clothes in a way that was painful"—the hearsay statements "were not *more* probative than the otherwise available live testimony." *Id.* As a result, the necessity requirement was not satisfied, and admission under the residual exception was error. *Id.*

Maldonado suggests this case is the same as *Skahill*, in that Carla's trial testimony had sufficient detail to negate the necessity requirement. He is right that

Carla's trial testimony, though brief, did provide some details on sexual abuse. After she testified to some background information, the prosecutor stated: "We're going to talk a little bit about something that happened a while ago. Okay, [Carla]?" Carla responded, "Okay," but then the guardian ad litem requested, "Can we pause?" Following an off-the-record discussion, testimony resumed with questions about Carla's favorite color and candy. The prosecutor then asked Carla about her understanding of private parts, and Carla testified that she calls a girl's private parts a "kola" and a boy's private parts a "nickel." In response to questioning, Carla was able to confirm that she used to live with Maldonado, but when asked: "when you lived with him there, did [Mya] and [Bryn] and your mom live there, too?" she stated she could not remember.

From there, the transcript reads as follows:

Q. Okay. Were there some times when it was just your dad home with you and [Bryn] and [Mya]? A. Yes.
Q. Was that while your mom was at work? A. Yes.
Q. Did your dad ever touch your kola, [Carla]? A. Yes.
Q. And when I ask if he touched it, did he touch it with his finger?
DEFENSE COUNSEL: Your Honor, I'm going to object. It's a leading question.
THE COURT: Let's rephrase the question.
Q. How did he touch your kola? A. His private parts and his hand, too.
Q. And when you say he touched it with his private parts, what—do you have a name for that? A. I forgot.
Q. That's okay. I know it's hard. Did it hurt when he touched your kola with his private parts? A. Yes.
Q. Did you tell him to stop? A. Yes.
Q. And what did he say? A. I just forgot.
Q. Okay. A. I need a break.
Q. Okay.

After a five-minute recess, Carla's testimony resumed:

> Q. [Carla], you told us earlier that your dad touched your kola with his privates? A. Yes.
> Q. Did he touch your kola with anything else? A. That's all.
> Q. Okay. And did you ever tell anyone? A. No.
> Q. Why didn't you tell anyone? A. Because my dad would be angry.
> Q. Did your dad ever tell you not to tell anyone? A. Yeah.
> Q. Do you remember what he said? A. No.
> Q. Okay. But you knew not to tell anyone? A. No.

The State then ended direct examination, and the defense declined cross-examination.

On appeal, while the State implicitly agrees Carla provided some information on the sexual abuse, it submits that the "admissibility requirement is generally met if 'the trial testimony had a significant gap or weakness' that rendered it less probative than the recorded statement, on any material point." According to the State, if the hearsay evidence provides important details missing from the child's in-court testimony, then the necessity requirement is met.

The *Skahill* court specifically noted *State v. Neitzel*, 801 N.W.2d 612 (Iowa Ct. App. 2011), was one of "[t]he two Iowa cases most directly on point" as to "when admission of a hearsay video interview was a necessity."[6] *Skahill*, 966 N.W.2d at 11–12. In *Neitzel*, when the complaining ten-year-old witness testified at the 2010 trial nearly three years after the abuse, she "answered several general questions and stated that she remembered having Neitzel as a babysitter when she stayed at her dad's house." 801 N.W.2d at 617. But "[w]hen she was asked if she could tell what happened the last time she saw Neitzel, she paused and then stated, 'I

---

[6] The other noted case was *State v. Rojas*, 524 N.W.2d 659 (Iowa 1994), but that case involved victim recantation during trial testimony, which was not present in *Skahill* and is not present in this case. *See Skahill*, 966 N.W.2d at 12.

don't remember.'" *Id.* Yet, in her forensic interview in 2007, the victim reported "Neitzel took her upstairs to her room, undressed her, laid on her, and touched his 'pee pee' on her 'private,' as well as saying that Neitzel was undressed and his 'pee pee' moved up and down inside her 'private.'" *Id.* The district court admitted the hearsay statements under the residual exception, which we affirmed. *Id.* at 621–23. On the necessity requirement, our court found "the evidence was necessary because [the victim] was of a young age when the abuse occurred and unable to testify to the abuse at trial years later, making the close-in-time video recitation . . . the most probative evidence of the abuse that occurred." *Id.* at 623.

Unfortunately, this case does not fit neatly within either *Neitzel* or *Skahill*, but instead falls somewhere in between. The victim in *Neitzel* could not remember the details of the abuse during her trial testimony. *See* 801 N.W.2d at 617. That is not the case here, since Carla was able to provide some testimony about the abuse. On the other hand, the victim in *Skahill* had no issues with memory loss or providing details of the abuse. *See* 966 N.W.2d at 15. That is also not entirely the case here.

So let's zero in on the supreme court's rationale for finding necessity was not met in *Skahill.* First, the victim "was responsive and forthcoming" in her testimony. *Id.* Here, Carla was reluctant and troubled. The district court viewed Carla's testimony first hand and found that although "she testified clearly that the Defendant committed a sex act against her," "it was clear and obvious that [she] struggled to testify in open court in relation to the allegations of abuse." The court observed that she was "very quickly upset," spoke with a shaky voice, and was quiet, fidgety, and tearful. We have also considered that Carla suffers from a

condition where "she doesn't think and interact with the world in a neurotypical way," which her therapist testified would affect her ability to testify.

Second, it was evident to the court in *Skahill* that the victim remembered what happened because she provided a detailed recitation of the sexual abuse, testifying that on one of the mornings while her mother was working,

> she sat on her dad's lap in a living room chair while they watched TV and fell asleep on his chest. When asked what happened when she woke up, she replied: "We were under the blanket, and he showed me his private." She went on to testify that Skahill asked her to "wiggle it." [The victim] also described being touched by Skahill: "He touched me on my privates in between my legs."
> [She] said the touching occurred under her clothes. She agreed that the touching could be described as a "brush up against" her privates but also answered that it was painful. [She] testified that after these things occurred, "Skahill told me that this was our secret." [She] testified that she was afraid of Skahill and avoided him the rest of the long weekend . . . .

966 N.W.2d at 5 (cleaned up). We do not have the same level of detail with Carla's testimony, during which she only provided brief and vague responses to questions about the sexual abuse, often saying that she did not remember. While Maldonado faults the State for not asking any "hard hitting" questions or pressuring Carla during testimony, the equally brief, vague, and resistant nature of her answers to questions in her deposition shortly before trial shows doing so would have been futile. Indeed, defense counsel pressed Carla in her deposition for details of the abuse, but she repeatedly stated she could not remember. On this record, unlike *Skahill*, it is not evident that Carla remembered the details of what happened.

Third, the victim's testimony in *Skahill* "was not hesitant or contradictory," *id.* at 15, while Carla's testimony was both. Carla first testified Maldonado touched her kola with both "his private parts and his hand, too." After a recess, Carla was

asked if he touched her kola with anything other than his private parts, and she stated: "That's all." During another exchange, Carla testified that she called a boy's private part a "[n]ickel," but when she was asked later, "when you say [your dad] touched it with his private parts . . . do you have a name for that?", Carla responded: "I forgot."

Finally, the victim's testimony in *Skahill* addressed "all of the critical points of the State's case." *Id.* Here, on the other hand, Carla's testimony provided no timeframe for the abuse. *Cf. United States v. Wandahsega*, 924 F.3d 868, 882 (6th Cir. 2019) (finding a child's inability to remember when the abuse occurred during his trial testimony was particularly important in upholding the admission of his hearsay statements under the exception); *accord Skahill*, 966 N.W.2d at 14 (discussing *Wandahsega*, 924 F.3d at 882). Nor did her testimony provide any context for the touching or the circumstances surrounding it. A critical element of the State's case was that the contact was sexual in nature. *See* Iowa Code § 702.17 (defining "sex act"). Carla's trial testimony offered little on this point. *See State v. Pearson*, 514 N.W.2d 452, 455 (Iowa 1994) (noting context and surrounding circumstances drive the determination of when contact is sexual in nature).

In our view, the circumstances present in *Skahill* that negated necessity are not present here. So that brings us back to the overarching question for admissibility under the residual exception: whether the forensic interview was "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." *Skahill*, 966 N.W.2d at 11

(quoting Iowa R. Evid. 5.807). Comparing Carla's testimony at trial,[7] which was vague, brief, and lacking in context, with her forensic interview where she provided significantly more detail and context, we conclude the answer is yes. *Cf. id.* at 8–9, 15 (rejecting the finding that the "slightly more detailed and contextualized" statements in a child's forensic interview satisfied the necessity prong of the residual exception). In Carla's video interview, unlike her trial testimony, she disclosed that Maldonado intercepted her making a bathroom trip in the middle of the night while her sisters were sleeping and her mother was away, touched her vagina with his fingers, and then smelled his fingers. Carla also reported Maldonado took off her pajamas and underwear and touched her butt with his genitals, which he took out of his underwear after unzipping his pants. While he was touching her with his genitals, Maldonado was "shaking."

Because we believe that the video interview tends to prove what happened to Carla better than her trial testimony in which she was subject to cross-examination, *see id.*, we conclude the necessity requirement was satisfied, and the court did not err in admitting the video under the residual hearsay exception.

## B. Sufficiency of Evidence

Maldonado next claims the evidence was not sufficient to support the sex-act element of his convictions on all counts and the serious-injury element on his convictions for first-degree sexual abuse.

A verdict will be upheld if substantial evidence supports it. *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018). "Evidence is substantial if, 'when

---

[7] Maldonado does not argue the State could have obtained other more probative evidence through reasonable efforts.

viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). Evidence is not insubstantial just because it might support a different conclusion; the only question is whether the evidence supports the finding actually made. *See State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021).

### 1. Sex act

For his challenge to the sufficiency of the evidence supporting his convictions, Maldonado first complains there was no "physical evidence demonstrative of sexual abuse." On that sentiment, he submits: "The State failed to prove element one . . . of each of the five . . . counts beyond a reasonable doubt." On element one of each count, the jury was instructed the State needed to prove Maldonado "performed a sex act" on Mya as to counts one through four and Carla as to count five.[8] The instructions defined "sex act" to mean any of the following sexual contact between two persons:

> 1. By penetration of the penis into the vagina or anus.
> 2. Between the mouth of one person and the genitals of another.
> 3. Between the genitals of one person and the genitals or anus of another person.
> 4. Between the finger or hand of one person and the genitals or anus of another person.
> 5. By the use of artificial sex organs or substitutes thereof in contact with the genitalia or anus.

---

[8] Maldonado does not raise any jury instruction errors on appeal. Unobjected-to jury instructions serve as the law of the case when reviewing the sufficiency of evidence. *State v. Banes*, 910 N.W.2d 634, 639 (Iowa Ct. App. 2018).

The instructions noted "the sex act alleged is hand or finger to genital contact" for count one, "genital to genital contact" for count two, "mouth to genital contact" for count three, and "genital to mouth contact" for count four. The instructions did not identify a specific sex act for count five, relating to Carla.

While Maldonado is correct that there was no physical evidence of sexual abuse, the supreme court has held that a "sexual abuse victim's testimony alone may be sufficient evidence for conviction." *State v. Donahue*, 957 N.W.2d 1, 10–11 (Iowa 2021). Maldonado acknowledges that Mya and Carla testified to the abuse detailed in each count. The jury also considered Carla's forensic interview. Viewing this evidence in the light most favorable to the State, and given the directive in the jury instructions that the jury could "consider the type of contact and the circumstances surrounding it in deciding whether the contact was sexual in nature," we find the evidence could convince a rational jury that Maldonado performed sex acts on his children beyond a reasonable doubt. *See Wickes*, 910 N.W.2d at 563. We accordingly reject Maldonado's challenge to the sufficiency of the evidence on this element of his sexual-abuse convictions.

> *2. Serious injury*

In part one of his brief, Maldonado touches on the serious-injury element of counts one through four, which required proof of a serious injury that could include a "disabling mental illness." Maldonado acknowledges "the State presented evidence that [Mya] suffered from [post-traumatic stress disorder] and possibly depression," but he argues "the State was unable to specify that the actions of the defendant were the direct cause of this condition and certainly not beyond a

reasonable doubt." In part three of his brief,[9] Maldonado adds to this claim, suggesting there was insufficient evidence that Mya suffered a disabling mental illness, that it was caused by the abuse, or that it was permanent or long term.

For starters, the jury instructions did not require a showing that the disabling mental illness be permanent or long term. And, viewing the evidence in the light most favorable to the State, the jury could rationally find Mya suffered a disabling mental illness and that it was caused by the abuse.

On counts one through four, the jury was instructed that the State had to prove that, "[d]uring the commission of sexual abuse, the defendant caused [Mya] a serious injury." The instructions defined a serious injury to include "a disabling mental illness," which in turn was defined as "an illness or condition which cripples, incapacitates, weakens or destroys a person's normal and usual mental functions." The jury was further instructed:

> [T]he "serious injury" need not occur simultaneously with the commission of the sexual abuse, but may precede or follow the sexual abuse if the injury and the sexual abuse occur as part of an unbroken chain of events or as part of one continuous series of acts connected with one another.[10]

The evidence shows that Maldonado's abuse of Mya began in the summer of 2019 and continued into the school year up until Mya's disclosure to her mother.

---

[9] While the heading of part three of Maldonado's brief kind of reads as a potential jury instruction challenge, the substance of the argument concerns the sufficiency of the evidence. To the extent that it is a challenge to the jury instruction he discusses, Instruction 36, it would not be preserved because Maldonado did not object to this instruction. *See State v. Fountain*, 786 N.W.2d 260, 262–63 (Iowa 2010) ("[O]bjections to giving or failing to give jury instructions are waived on direct appeal if not raised before counsel's closing arguments, and the instructions submitted to the jury become the law of the case.").

[10] Maldonado objected to the inclusion of this instruction at trial, but he does not reprise the challenge on appeal.

When asked whether the abuse changed her, Mya said that it had, explaining the "bad thoughts" she has about the abuse are overwhelming. She continued: "[A]nytime I do think about it, I cry." Mya told the jury that after the summer when her dad began the abuse, she started to cut herself. She now takes medication to help with her depression and anxiety, which she said helps a "little bit," although she still feels sad and scared a lot of the time. In her testimony, Mya's mother agreed something had changed in Mya—she kept to herself, she didn't eat, she had nightmares, she cried in her sleep, and she struggled with school.

Mya's therapist diagnosed her with post-traumatic stress disorder, the symptoms of which included "a whole variety of things" for Mya—anxiety, difficulty concentrating, invasive memories about the abuse, self-harm, and sleep disturbance. As an example, Mya's therapist, Diane Tonykyn, explained that Mya "would be sitting in class and supposed to be focusing on what the teacher is talking about, and she would have like memories and images of the . . . sexual abuse." Tonykyn testified Mya reported that all of these symptoms started after the sexual abuse by Maldonado, and she agreed the condition "has weakened or destroyed [Mya's] . . . normal mental functioning." The therapist continued to treat Mya at the time of trial, and she testified Mya's condition remained the same. While psychotherapist Kate Haberman, who specializes in childhood trauma, did not treat Mya, she testified at trial that depression and post-traumatic stress disorder are mental illnesses capable of crippling or weakening a person's normal mental functioning.

Viewing this evidence in the light most favorable to the State, it shows Mya's post-traumatic stress disorder was a disabling mental illness that was caused by

Maldonado's ongoing sexual abuse. *Cf. State v. Thompson*, Nos. 0-744, 00-0387, 2000 WL 1868961, at *5 (Iowa Ct. App. Dec. 22, 2000) (finding substantial evidence to support submission of jury instruction on serious injury where expert testified victim suffered from post-traumatic stress disorder caused by sexual abuse and threats against her life, victim will continue therapy on a long-term basis, and the condition impaired her daily, reasoning "[t]he evidence of the victim's mental and emotional status demonstrates she suffers from 'serious injury,' defined in the jury instructions as follows: 'a disabling mental illness; or condition which cripples, incapacitates, weakens or destroys a person's normal mental functions'"). We accordingly find sufficient evidence supports the serious-injury element of counts one through four.

## IV. Conclusion

We affirm Maldonado's convictions, finding the forensic interview was properly admitted under the residual exception and Maldonado's convictions enjoy substantial evidentiary support.

**AFFIRMED.**