# IN THE COURT OF APPEALS OF IOWA

No. 23-1027
Filed September 18, 2024

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**BRIENNA LYNN KERLIN,**
     Defendant-Appellant.
_____

Appeal from the Iowa District Court for Floyd County, Peter B. Newell, Judge.

A defendant challenges the sufficiency of the evidence supporting her conviction. **AFFIRMED.**

Heidi Miller of The Law Office of Heidi Miller, Pleasantville, for appellant.

Brenna Bird, Attorney General, and Katherine Wenman, Assistant Attorney General, for appellee.

Considered by Tabor, P.J., Ahlers, J., and Mullins, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**MULLINS, Senior Judge.**

Brienna Kerlin challenges the sufficiency of the evidence supporting her conviction for violating a custodial order. She argues the State failed to meet its burden to show she concealed her child from the child's father, who had physical care of the child pursuant to a court order.

## I.      Background Facts and Proceedings

Kerlin and Charles Barrett are the unmarried parents of B.B., born in 2013. A 2016 custody decree awarded Barrett physical care, with mid-week and alternating weekend visitation to Kerlin. The decree authorized the parents to deviate from that parenting time schedule upon agreement.

Barrett and B.B. lived in Charles City, Iowa. They lived in a home owned by Barrett's mother until January 11, 2022, when they had to move as a result of the home being sold as part of Barrett's mother's estate proceeding. Barrett and Kerlin agreed that B.B. would stay with Kerlin for "[t]hree or four" days while Barrett moved into a new apartment.[1] At the time, Barrett knew where Kerlin was living in Rudd, Iowa. Barrett testified Kerlin did not return B.B. to him after the three or four days they agreed upon. Barrett contacted Kerlin and told her to return B.B., but Kerlin said she wouldn't and ultimately didn't. Kerlin advised Barrett he could come pick up B.B. Barrett tried to do so twice, but on both occasions, Kerlin's boyfriend answered the door, refused to let Barrett in, and told him to get off his property. Barrett did so.

---

[1] Barrett's new apartment fell through, so he stayed in a temporary apartment until he arranged to move into a new home on February 1.

Barrett contacted local law enforcement multiple times, but "[t]hey told [him] that there was nothing they could do" and he "needed an attorney," which he couldn't afford. After Barrett's attempts to go to Kerlin's home and retrieve B.B., Kerlin applied for a protective order against Barrett, alleging he threatened her. Kerlin also filed a petition to modify the custody decree. The protective order was later dismissed for lack of evidence and the modification application was denied. Barrett later found out that Kerlin contacted B.B.'s school in Charles City and advised that B.B. had moved. Kerlin then enrolled B.B. in a different school district. Call-for-service records show Kerlin told officers responding to Barrett's calls that she had full custody of B.B. and was in the process of switching her school.

In late January, Barrett filed a contempt application in the custody proceeding, alleging Kerlin was refusing to bring B.B. home and had cut off all contact. After apparently getting impatient, Barrett contacted the county attorney directly on March 14 and reported Kerlin's refusal to return B.B. and her recent move to Rockford, Iowa, which she did without providing Barrett with her new address. Barrett explained in his testimony that he only knew they were living in Rockford because he did have contact with B.B. over the phone and through messaging. However, B.B. or Kerlin never provided Barrett with a specific address. He only learned of her address through court documents shortly before he contacted the county attorney.

Investigator Dan Sargent of the Floyd County Sheriff's Department was contacted by the county attorney on March 14 and began looking into the matter. He met with Barrett the following day and ultimately contacted Rockford school officials and learned B.B. was enrolled there. Investigator Chad Weber went with

Barrett to the School to retrieve B.B., while Investigator Sargent filed a criminal complaint against Kerlin for violating a custodial order, which was served upon Kerlin later that day.

Kerlin's boyfriend, Daniel Connerley testified that he picked up B.B. from Barrett on January 10, and Barrett did not try to contact any of them for "a week and a half or so." After that, Barrett came to their house in Rudd on two occasions to retrieve B.B. Connerley testified he asked Barrett to leave both times and, on the second occasion, Barrett threatened Kerlin. Last, Connerley said they moved to Rockford in early March.

Kerlin herself testified she became worried about B.B. being in Barrett's care in December 2021 when she found out the house they were living in went up for sale. Kerlin claimed Connerley picked up B.B. on January 10, then four days passed with no word from Barrett. So, according to Kerlin, she called Barrett, who told her he lost his apartment and didn't have a stable living arrangement. Kerlin claimed she told Barrett thereafter that B.B. wanted to enroll in Rockford schools, When Barrett didn't agree, Kerlin filed her modification petition and believed she was authorized to change B.B.'s school. According to Kerlin, she had "[q]uite a few" discussions with Barrett about where she and B.B. were living, and she sent him a "link" of where they were moving and told him what the address was on March 1. She also claimed Barrett knew where they lived because he and B.B. contacted each other through text messages. But, of the text messages between Barrett and B.B. that Kerlin submitted as evidence, none of them discussed where B.B. and Kerlin were living. Last, Kerlin claimed that she tried to return B.B. to

Barrett on one occasion, but he essentially wouldn't give her a straight answer about where he was living.[2]

Following the State's case-in-chief at trial, Kerlin moved for judgment of acquittal, arguing she did not conceal B.B. from Barrett because he learned by March 1 that they were living in Rockford and had ongoing communication with B.B. The court denied the motion, as well as the renewed motion following the presentation of the evidence for the defense. The jury found Kerlin guilty as charged, and she appealed following the imposition of sentence.

## II. Standard of Review

We review challenges to the sufficiency of evidence for errors at law, giving deference to the verdict. *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). "We view the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (quoting *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017)). All evidence is considered, not just that of an inculpatory nature. *See Huser*, 894 N.W.2d at 490. A verdict will be upheld if substantial evidence supports it. *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'" *Id.* (citation omitted). Evidence is not rendered insubstantial merely because it might support

---

[2] In their testimony, both Kerlin and Connerley admitted to previously being convicted of various crimes involving dishonesty or false statement. *See* Iowa R. Evid. 5.609(a)(2).

a different conclusion; the only question is whether the evidence supports the finding actually made. *See State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021).

## III. Discussion

The jury was instructed the State was required to prove, among other things, that Kerlin concealed B.B. from Barrett in violation of a court order. In challenging the sufficiency of the evidence supporting her conviction, Kerlin argues the State failed to meet its burden to show she concealed B.B. from Barrett. According to Kerlin, the evidence shows B.B. was with her upon agreement of the parents, Barrett knew of her whereabouts, and he was allowed contact with B.B.

Trouble is, Kerlin's "challenge is entirely based on [her] slanted version of events," and "the jury did not have to accept that version." *State v. Thomas*, No. 22-1746, 2024 WL 960916, at *2 (Iowa Ct. App. Mar. 6, 2024). The evidence shows Kerlin took steps to keep B.B. from Barrett after their agreed departure from the terms of the custody decree expired. Kerlin refused to return B.B. and, when Barrett attempted to retrieve her, he was turned away. Kerlin then applied for a restraining order and changed B.B.'s school and residence without telling Barrett. While Kerlin argues Barrett "knew at all times . . . where [B.B.] was residing and attending school," Barrett testified to the contrary. Viewing this evidence in the light most favorable to the State, it could easily convince a rational jury that Kerlin concealed B.B. from Barrett.

## IV. Conclusion

We affirm the conviction as supported by substantial evidence.

**AFFIRMED.**