# IN THE COURT OF APPEALS OF IOWA

No. 23-1588
Filed April 9, 2025

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**OCTAVIUS ZENUS SALLIS,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Meghan Corbin, Judge.

A defendant appeals his conviction for homicide by vehicle, challenging the sufficiency of the evidence. **AFFIRMED.**

Christopher A. Clausen of Clausen Law Office, Ames, for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.

Considered without oral argument by Greer, P.J., and Langholz and Sandy, JJ.

**SANDY, Judge.**

Octavius Sallis appeals his conviction for homicide by vehicle by operating while intoxicated in violation of Iowa Code section 707.6A(1) (2023), challenging the sufficiency of the evidence supporting the conviction. Specifically, he asserts the evidence was insufficient to establish that (1) he was intoxicated while driving and (2) his intoxication caused the death of the victim.

Because we conclude the jury's verdict is supported by substantial evidence, we affirm.

## I. Background Facts and Proceedings

At around 8:30 p.m. on May 18, 2022, Sallis was traveling in his Dodge Journey westbound on Kimberly Road in Davenport. As he approached the four-way intersection of Kimberly Road and Fairmount Street, Sallis merged into the left turn lane to turn left onto Fairmount Street. This intersection is controlled by traffic lights on each side.

At the time Sallis attempted to turn left onto Fairmount Street, the lights for traffic traveling eastbound and westbound on Kimberly Road were solid green, meaning vehicles turning left on either side were required to yield to oncoming traffic. However, Sallis rolled through the intersection at a speed of seventeen miles per hour and failed to yield to oncoming traffic. As he turned left through the intersection, Sallis's vehicle collided with a motorcycle driven by Michael Vickers. The collision sent Vickers and his motorcycle soaring through the air. Vickers landed nearly sixty feet from the point of impact with Sallis's vehicle. Vickers suffered multiple blunt force injuries from the collision, including severe injuries to

his head, chest, and abdomen area. He succumbed to these injuries shortly thereafter.

Within minutes of the collision, multiple police officers with the Davenport Police Department were dispatched to the scene. One of those officers was Officer Justin Adams. After Officer Adams arrived on scene, he immediately approached Sallis's vehicle to check on him. Officer Adams found Sallis sitting slouched and dazed in the driver's seat. A deployed airbag was hanging down from the steering wheel. One bystander who witnessed the accident told Officer Adams he believed Sallis lost consciousness immediately after the collision. Officer Adams advised Sallis that he should go to the hospital to be checked out if he had lost consciousness, but Sallis declined transportation to the hospital.

Officer Adams then asked Sallis for information on what had occurred. As Officer Adams testified at trial, Sallis reported "he was traveling westbound on Kimberly, he was going to take a—turn left onto Fairmount Street to head south, and he had a green light but no green arrow, and then the motorcycle was coming eastbound on Kimberly from the west."

As Officer Adams was talking with Sallis, he began to suspect Sallis was intoxicated. According to Officer Adams, Sallas had "bloodshot/watery eyes, slow, lethargic movements." Another officer described Sallis as having a "slow, methodical" demeanor and "deliberate and slow speech." After speaking with several eyewitnesses, Officer Adams asked Sallis if he would consent to field sobriety testing. Sallis agreed.

Officer Adams conducted three field sobriety tests. He first had Sallis perform the horizontal-gaze-nystagmus test. Officers Adams described the test in his testimony:

> So the procedure starts with him standing with his legs straight, his arms at his side, straight up. It tests the involuntary eye movement of impaired drivers. Specifically, under alcohol, they typically have, or should have, nystagmus, which is the involuntary eye movement.
>
> I stand about a foot away, with my finger—I always use my finger as the point for him to look at, about a foot away from his face as well. There's four steps. One is to test pupil size and to make sure he's tracking the finger; and the next one is to look for smooth pursuit, making sure the eyes are following the finger smoothly; and there's nystagmus at max deviation, and nystagmus onset prior to forty-five degrees.

Officer Adams added that the horizontal-gaze-nystagmus test evaluates six possible clues of impairment. A score of four out of six indicates an individual is impaired. Sallis "scored six out of six."

The next test Sallis performed was the walk-and-turn test. Officer Adams testified that during this test, individuals "take nine steps down the line, are supposed to take a turn by taking a series of small steps, and then another nine steps back down the line." Sallis was instructed to do this with his arms at his side throughout the test. Officer Adams stated there are eight possible clues of impairment the walk-and-turn test attempts to discern and that a score of two out of eight indicates impairment. Sallis scored five out of eight. Officer Adams described Sallis's balance as "poor" during the test. According to Officer Adams, Sallis

> stepped off the line prior to starting, which is a clue. He stepped off the line going both directions, the first nine steps and the second nine steps. On the first nine steps, he raised one of his arms greater than six inches. He also counted ten steps on the first nine instead of nine

steps. And I believe he missed heel to toe greater than half an inch on both directions.

Lastly, Officer Adams had Sallis perform the one-leg stand test. He testified that this test

> starts as the horizontal gaze nystagmus test, with both feet together, legs straight, arms at their side. They are then instructed to raise their foot approximately six inches off the ground, with their foot pointed straight, so that way their bottom of their foot is parallel to the ground, and then they are instructed to count to thirty seconds.

Officer Adams stated Sallis scored "a two out of four" on the test, indicating impairment. Officer Adams observed Sallis "swaying and hopping" during the test. Due to Sallis failing the field sobriety tests, Officer Adams believed he was intoxicated. Following the tests, Sallis requested to be transported to the hospital.

Prior to Sallis being transported to the hospital, Officer Adams requested evaluation by a drug recognition expert (DRE). Iowa State Trooper James Lancaster—a certified DRE—was subsequently dispatched to the scene to perform an evaluation. Trooper Lancaster testified that DREs are

> brought in after the fact, if, say, for instance a, a subject's out on the road and they find that they're impaired after doing the three battery standard field sobriety tests but they don't have any alcohol in their system or they can rule alcohol out, then they would ask a DRE to come in and evaluate the subject. If the subject cooperates, we do a twelve-step process. We call it a DRE evaluation. At the end of the DRE evaluation, I form an opinion on what drug is in his body, or her body, and what's impairing him at that time.

Before Trooper Lancaster could begin his evaluation, Sallis was loaded into an ambulance to be transported to the hospital. However, Trooper Lancaster spoke briefly with Sallis in the ambulance before he was transported to the hospital. While speaking with Sallis in the back of the ambulance, Trooper Lancaster noticed "a moderate odor of alcohol—of an alcoholic beverage coming from his person."

Trooper Lancaster subsequently followed the ambulance to the hospital. At the hospital, he asked Sallis to consent to a DRE evaluation. Sallis agreed.

Trooper Lancaster first had Sallis perform the modified Romberg test, which asks an individual to stand with their feet together, tilt their head backwards, close their eyes, and estimate the passage of thirty seconds. Trooper Lancaster testified certain categories of drugs "will slow the body down, speed the body up, so that thirty seconds helps us determine if they're sped up or slowed down." Sallis estimated the passage of thirty seconds in approximately thirty-two seconds. But during the test, Trooper Lancaster observed "eyelid tremors and body tremors," indicating impairment.

Trooper Lancaster next performed the horizontal-gaze-nystagmus test. During this test, Trooper Clary identified four out of six possible clues of impairment. According to Trooper Lancaster, Sallis "showed lack of smooth pursuit and distinct and sustained nystagmus at maximum deviation." Trooper Lancaster also noted Sallis had "bloodshot/watery eyes."

Trooper Lancaster then performed an oral cavity search to assess whether Sallis had recently used drugs. During the oral cavity search, he noticed a "very strong" odor of marijuana emanating from Sallis. In his words, "I could smell another strong odor of alcohol, but it was being overwhelmed by an odor of marijuana." Trooper Lancaster also observed a "green coating" and "some heat bumps" on Sallis's tongue. Trooper Lancaster testified these indicated Sallis had recently smoked marijuana.

Following these tests, Trooper Lancaster spoke extensively with Sallis on what had occurred that day prior to the accident. While talking with Sallis, he

noticed his speech was "[m]umbled and slurred." During their conversation, Sallis admitted to being "an avid user of marijuana and that he consumed marijuana about three hours prior to driving that day." Trooper Lancaster testified that the effects of marijuana use typically last about two to three hours. Sallis also disclosed "that about that same time [as he used marijuana] he had a twenty-five-ounce can of Bud Ice." Based off Sallis's test results and statements, Trooper Lancaster testified that he believed Sallis was under the influence of marijuana and alcohol.

While Trooper Lancaster was performing a DRE evaluation with Sallis, Officer Adams applied for and received a search warrant to extract a sample of Sallis's blood and urine. A blood and urine sample were extracted from Sallis at the hospital just before midnight. These samples were subsequently sent to the Iowa Department of Criminal Investigation Criminalists (DCI) laboratory for testing.[1] Testing of Sallis's urine sample revealed the presence of metabolites of amphetamines, cocaine, and marijuana. Additionally, cocaine and marijuana metabolites were found in Sallis's blood sample. Testing of Sallis's blood sample disclosed he had a blood alcohol concentration of .142 at the time of extraction—well above the legal limit. *See* Iowa Code § 321J.2(1)(b) (providing that the legal limit in Iowa is "an alcohol concentration of .08 or more.").

---

[1] Madison Martin—a DCI criminalist—testified at Sallis's trial concerning the difference between blood and urine samples. As she explained, "[s]o the blood specimen is a sample that's looking at more recent use, so the last few hours, versus a urine specimen is going to be looking at use in the last few days, so it could have been three or four days for that specimen."

Sallis was subsequently arrested and charged by trial information with homicide by vehicle by operating while intoxicated; operating while intoxicated, third offense; possession of a controlled substance, third or subsequent offense; and unlawful possession of a prescription drug. Sallis entered into a plea agreement with the State and pled guilty to possession of a controlled substance and unlawful possession of a prescription drug. He proceeded to a jury trial on the counts of homicide by vehicle by operating while intoxicated and operating while intoxicated. A jury convicted him on both counts.[2]

This appeal followed.

## II. Standard of Review

"Sufficiency of the evidence claims are reviewed for correction of errors at law, and we will uphold a verdict if substantial evidence supports it." *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018) (citation omitted). "Substantial evidence exists when the evidence 'would convince a rational fact finder the defendant is guilty beyond a reasonable doubt.'" *State v. Buman*, 955 N.W.2d 215, 219 (Iowa 2021) (citation omitted). "We view the evidence in the light most favorable to the State, 'including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017) (citation omitted).

## III. Analysis

The jury was instructed that to find Sallis guilty of homicide by vehicle by operating while intoxicated the State was required to prove:

---

[2] Because operating while intoxicated is a lesser-included offense of homicide by vehicle by operating while intoxicated, Sallis's convictions on these counts merged.

1. On or about the 18th day of May, 2022, the defendant operated a motor vehicle.

2. At that time, the defendant either:

a. was under the influence of alcohol or a drug or a combination of such substances; or

b. had an alcohol concentration of .08 or more, or

c. had any amount of a controlled substance present in his system as measured in the defendant's blood or urine.

It is not necessary for all jurors to agree to just (a) or (b) or (c). It is only necessary that each juror agrees to at least one of these three alternatives.

3. The defendant's act or acts set out in Elements 1 and 2 unintentionally caused the death of Michael Vickers. Cause is established if the defendant act or acts set out in Elements 1 and 2 were a substantial factor in bringing about the death of Michael Vickers, and the death of Michael Vickers would not have happened except for those acts.

On appeal, Sallis contends the evidence was insufficient to show that "he was impaired, and if he was impaired, that the impairment caused the unintentional death of the decedent." He goes on to argue "there is no evidence in the record to support that he was impaired or that his impairment caused Michael Vicker[s]'s death. There is no evidence to support Michael's Vicker[s]'s death would not have occurred absent impairment, if any was proven." We disagree with Sallis on both points and conclude substantial evidence supports the jury's conclusions that he was intoxicated and that his intoxicated driving caused Vickers's death.

Beginning with Sallis's intoxication argument, "Iowa's homicide-by-intoxicated-operation statute makes it a crime to unintentionally cause someone's death 'by operating a motor vehicle while intoxicated, as prohibited by section 321J.2.'" *State v. Johnson*, 950 N.W.2d 232, 236 (Iowa 2020) (quoting Iowa Code § 707.6A(1)). "The definition of 'intoxicated' means a person is under the influence of alcohol or drugs (or some combination of them), has a blood alcohol content .08 or greater, *or* has any amount of a controlled substance present

as measured in a blood or urine test." *Id.* (emphasis added) (citing Iowa Code § 321J.2).

Here, there was substantial evidence Sallis was intoxicated within the meaning of section 321J.2. The State presented evidence that Sallis's urine sample contained metabolites of amphetamines, cocaine, and marijuana. The State also presented evidence that Sallis's blood contained metabolites of cocaine and marijuana. This evidence alone was sufficient to establish Sallis was intoxicated at the time he was driving. *See* Iowa Code § 321J.2(1)(c) (providing an individual operates a vehicle while intoxicated if "*any* amount of a controlled substance is present in the person, as measured in the person's blood or urine." (emphasis added)).

Additionally, the State presented substantial evidence that Sallis had a blood alcohol concentration of .08 or greater at the time he was driving. *See id.* § 321J.2(1)(b) (providing that a person is operating a vehicle while intoxicated if they are driving with "an alcohol concentration of .08 or more"). Sallis admitted to Trooper Lancaster that he drank at least one twenty-five-ounce beer about three hours prior to driving. The jury was also presented with evidence that at the time Sallis's blood sample was extracted, his blood alcohol concentration was .142 grams of alcohol per one hundred of milliliters of blood—well over the legal limit. Sallis's blood sample was extracted nearly three hours after the accident. The jury heard testimony from James Bleskacek—a DCI criminalist who performed an alcohol analysis of Sallis's blood sample—that, "[o]n average, a person eliminates alcohol at a range of around .015 to .019 grams of alcohol per hour." Thus, the

jury could reasonably infer that Sallis's blood alcohol concentration was well over .08 at the time he was driving.

Further, there was substantial evidence Sallis was under the influence of alcohol while driving. *See id.* § 321J.2(1)(a) (providing that an individual operates a vehicle while intoxicated if they are "under the influence of an alcoholic beverage"). Sallis admitted to having at least twenty-five ounces of beer three hours prior to driving. Two police officers observed that Sallis had "bloodshot/watery eyes." Officer Adams testified that Sallis had "slow, lethargic movements" and displayed "poor" balance during field sobriety testing. Trooper Lancaster testified that his speech was "[m]umbled and slurred."

Based partly on these observations, both officers testified they believed Sallis was intoxicated, with Trooper Lancaster opining that Sallis was under the influence of alcohol. *See State v. Shannon*, No. 17-0717, 2018 WL 1182561, at *2 (Iowa Ct. App. Mar. 7, 2018) (finding an officer's observations of signs of impairment provides substantial evidence that a defendant was under the influence); *see also State v. Blake*, No. 15-1771, 2016 WL 4384253, at *2 (Iowa Ct. App. Aug. 17, 2016) ("The court may also consider an officer's opinion regarding another person's sobriety."). Moreover, Sallis failed three field sobriety tests. *See State v. Bunce*, No. 13-1024, 2014 WL 1494961, at *2 (Iowa Ct. App. Apr. 16, 2014) ("Field sobriety tests allow officers to assess whether a driver is under the influence of alcohol."). For the foregoing reasons, we conclude substantial evidence supports the jury's determination that Sallis was intoxicated.

Moving onto Sallis's causation argument, to convict a defendant of homicide by vehicle the State "must prove a causal connection between the defendant's

intoxicated driving and the victim's death." *State v. Adams*, 810 N.W.2d 365, 371 (Iowa 2012). This type of causation is known as "factual causation." *Id.* at 372. "The determination of factual causation turns simply on whether 'the harm would not have occurred absent the [defendant's] conduct.'" *Id.* (citation omitted).

Applying these principles, we conclude there is substantial evidence to support the jury's determination that Sallis's intoxicated driving caused Vickers's death. Sallis admitted to Trooper Lancaster that he consumed alcohol and marijuana three hours prior to driving. Additionally, he all but admitted to Officer Adams that he failed to yield to oncoming traffic, which resulted in the collision with Vickers's motorcycle. Such admissions provide substantial evidence for the jury to conclude Vicker's death would not have occurred absent Sallis's intoxicated driving. *See State v. Hernandez-Mendoza*, No. 18-0083, 2019 WL 1932539, at *2 (Iowa Ct. App. May 1, 2019) (concluding the defendant's admissions to consuming alcohol and marijuana prior to driving and driving his vehicle off the road—leading to the victim's death—provided substantial evidence of factual causation).

Further, the jury heard testimony from Justin Grodnitzky—a DCI criminalist—that alcohol generally impairs a person's judgment and ability to drive. He also testified that marijuana use would have a similar effect. He added that alcohol and marijuana generally interact negatively to affect driving. Moreover, he referenced "epidemiological studies" in his testimony that show an individual is twenty-three times more likely to be involved in a fatal crash if they have alcohol and marijuana in their system at the time. This evidence—combined with the evidence concerning Sallis's intoxication—provides substantial evidence to support the jury's conclusion that Sallis's intoxicated driving caused Vickers's

death. *See State v. Schaul*, No. 15-0466, 2016 WL 2745934, at *4 (Iowa Ct. App. May 11, 2016) (concluding evidence of a defendant's intoxication combined with an expert's testimony that "blood alcohol content as low as .05 can result in lack of coordination, slowed reaction time, diminished ability to pay attention, decreased peripheral vision, and a slower ability to adapt to changes in light" constituted substantial evidence of factual causation).

Accordingly, we conclude the jury's verdict was supported by substantial evidence.

## IV. Conclusion

Because we conclude Sallis's conviction is supported by substantial evidence, we affirm.

**AFFIRMED.**