**IN THE COURT OF APPEALS OF IOWA**

No. 24-1107
Filed December 3, 2025

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**RANDY LEE PATRIE,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Chickasaw County, Richard D. Stochl, Judge.

A criminal defendant appeals his conviction for first-degree murder. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Maria Ruhtenberg (until withdrawal) and Josh Irwin, Assistant Appellate Defenders, for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.

Considered without oral argument by Schumacher, P.J., Sandy, J., and Telleen, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**TELLEEN, Senior Judge.**

Following a jury trial, Randy Lee Patrie was convicted of first-degree murder. The State presented evidence that Patrie used a sawed-off shotgun to shoot the victim, a retired grocery store owner, in the right temple at point-blank range. Patrie appeals his conviction, arguing that the State presented insufficient evidence of his guilt. Because the evidence of Patrie's guilt is overwhelming, we affirm.

## I. Background Facts and Proceedings

The victim of the murder was a retired grocery store owner who lived alone in a home out in the country in Nashua, Iowa. The last date anyone saw the victim alive was on the afternoon of September 25, 2012. On October 2, a friend showed up to the victim's home to request permission to hunt on the victim's property. The friend regularly hunted there but still sought official permission from the victim. The victim did not answer the door that day and his phone line was busy. The friend returned two days later after noticing "the bird feeders were all empty and the birdbaths were empty." The victim still did not answer the door despite his truck being parked at the home. The friend noticed that the victim's mailbox was full and looked through the front window and observed that the interior of the home was ransacked; "[t]he refrigerator was tipped over and the cushions were thrown on the floor and the pictures were thrown off the wall," despite the victim normally keeping an "immaculate" home.

The friend reported the suspicious circumstances to law enforcement who then came out to the victim's house to conduct a welfare check. Upon entering the home and after walking into the victim's bedroom, the deputy found the victim's

body lying in his bed covered by a bookshelf, books, video tapes, and other debris. The victim had a gunshot wound to the head. Law enforcement confirmed that the home was ransacked and items were missing, including a television, night vision scope, decoy security camera, some power tools, and three guns. A garage door opener was missing from the victim's truck. Law enforcement opined that it would have been difficult to enter the home other than through the garage door due to metal and wood bars holding the doors shut and one garage door being held shut with a metal clamp. The missing items were not reported to the press.

The medical examiner determined the cause of death was a shotgun blast to the right temple, fired at a range of approximately a few inches from the victim's head, due to the wad cup being found inside the victim's head. A ballistics expert testified that, due to the scratch patterns on the wad, the shot had been fired by a sawed-off .410 shotgun.

The investigation did not yield immediate results but in July 2013, law enforcement searched Patrie's home for unrelated reasons. Power tools, a decoy security camera, a night vision scope, and a police scanner consistent with those missing from the victim's home were found. A television was found that matched the serial number of the missing television from the victim's home. Three firearms of the exact same make and model as the firearms missing from the victim's home were found—two of which were stuffed into the insulation of Patrie's attic. A sawed-off .410 shotgun was also found in the home. Patrie, unprompted and before being asked about any guns, told an Iowa Division of Criminal Investigation (DCI) special agent, "I'm not going to give you the name of the guy that I got these guns from. I didn't steal these fucking guns." The individuals Patrie claimed to

have acquired the weapons from either had alibis for the date of the murder or were deceased. Patrie admitted to "falsely accus[ing]" one of the individuals with an alibi of giving him one of the guns. He claimed to not know where the victim lived.

Several years later, the defendant revised his story as to what happened the night of September 25 and the morning of September 26. He claimed that he was home that night to consume methamphetamine and his uncle came to the house at 3:00 a.m. to borrow his car and returned it later that day. Because Patrie's uncle had the car, Patrie claimed he called in sick for work at 7:00 a.m. According to Patrie, his uncle called him after Patrie had called in sick for work and gave him all the stolen property in the vehicle. Phone records revealed that Patrie did not call his employer at 7:00 a.m. as he claimed and that he never received a phone call from his uncle.

The State charged Patrie with first-degree murder in January 2022, and the jury returned a verdict convicting him as charged. Patrie moved for new trial and in arrest of judgment, challenging sufficiency and weight of the evidence and alleging that Patrie was deprived of due process. The district court denied Patrie's motion. Patrie now appeals.

## II. Standard of Review

We review challenges to the sufficiency of evidence for corrections of legal error. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). We will uphold the verdict if it is supported by substantial evidence. *Id.* Substantial evidence is evidence that, "when viewed in the light most favorable to the State," could convince a rational factfinder of Patrie's guilt beyond a reasonable doubt. *Id.* We

recognize that "the jury is free to reject certain evidence, and credit other evidence." *Id.* (cleaned up).

### III. Discussion

It is the State's burden to prove every element of the crime charged. *State v. Armstrong*, 787 N.W.2d 472, 475 (Iowa Ct. App. 2010). The jury was instructed that the State had to prove the following elements:

> 1. On or between September 25, 2012, through October 4, 2012, [Patrie] shot [the victim].
> 2. [The victim] died as a result of being shot.
> 3. [Patrie] acted with malice aforethought.
> 4. [Patrie] acted willfully, deliberately, premeditatedly and with the specific intent to kill [the victim] or [Patrie] was participating in the offense of Burglary . . . .

Patrie argues the State presented insufficient evidence that he shot the victim. When reviewing a conviction for sufficiency of the evidence, "[w]e view the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (citation omitted). We will uphold a conviction "if substantial evidence supports it." *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018) (citation omitted). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational [factfinder] that the defendant is guilty beyond a reasonable doubt.'" *Id.* (citation omitted). Evidence is not insubstantial purely because it may support a different conclusion; we simply ask whether evidence supports the finding actually rendered. *See State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021).

Patrie focuses his argument on what he characterizes as the documented unreliability of "jailhouse snitch testimony." But because jailhouse testimony is

"highly relevant and . . . the matter of credibility [is] for the jury," our courts allow for its admission at trial, especially since "there is currently no toolbox of consensus scientific principles that apply to the testimony of jailhouse informants." *State v. Liggins*, 978 N.W.2d 406, 427 (Iowa 2022). Patrie cites to no controlling authority for his proposition that "[n]o conviction carrying a mandatory sentence of life without parole should be primarily based on such unreliable testimony." The reliability of jailhouse testimony is for the factfinder to determine. *See id.*

The jailhouse informants in this case testified that Patrie had admitted to key facts just as the State alleged they occurred, including that Patrie entered the victim's home through the garage with a stolen garage opener obtained while doing some work for the victim, that Patrie believed there was a safe full of cash in the home, and that Patrie shot the victim with a .410 shotgun and "covered the [victim] with books and bookcase" because he felt like the dead victim was staring at him. Even without the jailhouse informants' testimony, the evidence against Patrie was sufficient to convict him of first-degree murder.

Patrie argues that his uncle planned the robbery, knew where the victim lived, and recruited Patrie to rob the victim. Even if true, none of those facts contradict a factfinder's conclusion that Patrie was guilty as charged. And Patrie does not attempt to counter any of the other strong evidence against him besides asserting that his uncle's testimony was self-serving—a point Patrie had the opportunity to emphasize to the jury during cross-examination.

Patrie's uncle testified to the interest Patrie showed in the victim's home and that Patrie had been casing the home. Patrie's uncle found out "at some point" before the murder that the victim had $30,000 stolen from an open safe in his

home. In conversation a few weeks before the murder, Patrie's uncle informed Patrie that the victim had a large amount of cash stolen from a safe and, at one point, he pointed out the house to Patrie while they were driving through town. Patrie proceeded to ask questions about the home such as whether the home had dogs. Sometime after that conversation, Patrie told his uncle that "he ran out of gas or had a flat" outside of the victim's home and had used the victim's telephone at the victim's home. Patrie also asked his uncle if he would accompany Patrie to go rob the victim, claiming the victim would be an "easy mark."

A DCI agent testified to the large amount of debt Patrie owed—over $30,000—in addition to a home mortgage and relatively low income of $1200 per month. Patrie's wife testified that, on the night of the murder, she woke up around 2:00 a.m. and Patrie was not in bed or any other part of the house and his car was not in the driveway, causing her to wonder where he went because this behavior was not normal. He did not appear home again during the "hour or two" it took her to get back to sleep. Patrie was also not there when his wife woke up in the morning, which "upset [her] because normally he is" home in the morning.

Shortly after 7:00 a.m., Patrie arrived home and backed up the vehicle to his garage and started unloading items from the vehicle, including several firearms. Firearms were missing from the victim's home following the murder. Patrie's wife also testified that Patrie owned a sawed-off shotgun and that she had seen it in his shed prior to the murder. Patrie's wife was with Patrie when the victim's death was announced on the news, which caused Patrie's face to turn "white as a ghost," and she observed "a shocked look on his face."

Patrie discussed the crime with his uncle, calling the victim an "easy mark," and had cased the victim's home. Patrie was missing from his home the night of the murder, which was described by his wife as unusual. Patrie returned the next morning and unloaded what appeared to be the stolen items from his vehicle. He owned a sawed-off .410 shotgun, which was the weapon used to murder the victim in his bed. He was in possession of many of the exact items that were missing from the victim's home, including television with matching serial number and firearms hidden in the insulation of his attic. Patrie changed his story years later and provided a retelling that included verifiably false information. He falsely accused an individual who turned out to have an alibi. Multiple jailhouse informants provided consistent stories detailing Patrie's admissions relating to the murder. In short, the evidence against Patrie, as the district court described, is overwhelming. The State presented sufficient evidence for a reasonable factfinder to conclude beyond a reasonable doubt that Patrie committed first-degree murder. We affirm.

**AFFIRMED.**